ELECTRONICALLY FILED February 20, 2009

KENT R. ROBISON, ESQ. (Nevada Bar No. 1167)
Robison, Belaustegui, Sharp & Low
71 Washington Street
Reno, Nevada  89503
Telephone: (775) 329-3151
Facsimile:  (775) 329-7169

-and-

ANDREW R. LEE, *pro hac vice*
AIMEE M. QUIRK, *pro hac vice*
EMILY E. EAGAN, *pro hac vice*
Jones, Walker, Waechter, Poitevent,
   Carrère & Denègre, L.L.P.
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone:  (504) 582-8664
Fax:  (504) 589-8664

Attorneys for Plaintiff, Talisman Capital Talon Fund, Ltd.

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

TALISMAN CAPITAL
TALON FUND, LTD.,

         Plaintiff,

                                                    Case No. CV05-N-0354-BES-VPC
vs.

RUDOLF W. GUNNERMAN AND
SULPHCO, INC.,

         Defendants.
_____/

**PLAINTIFF'S POST-TRIAL BRIEF**

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}

1

**TABLE OF CONTENTS**

2

**STATEMENT OF FACTS** ..................................................................................................1

    **I.**      **Overview of the Case** ............................................................................1

    **II.**     **The TTAA** .................................................................................................2

        A.     The TTAA Is Valid. ..........................................................................2

        B.     The TTAA Conveyed Specifically Defined Intellectual Property Related to the "Field" of the 1994 Exclusive License Agreement ............................................3

    **III.**    **The SRT Falls Within the "Field" of the TTAA** ...............................5

    **IV.**    **Interpretation of the TTAA** ...............................................................9

        A.     April 2003 Communications Support Plaintiff's Interpretation ............................10

        B.     The Two Parties to the TTAA Intended That the ELA Field Would Be Conveyed .........................................11

        C.     Contrary Intent Was Not Expressed Through The Termination And Release Agreement .........................................12

        D.     Contrary Intent Was Not Expressed by the Absence of the SulphCo Patents From the TTAA Appendix ..........................................16

        E.     Defendants' Case On "Intent" Cannot Be Reconciled With Gunnerman's Testimony .........................................18

        F.     In Violation of His Representations and Warranties, Gunnerman Failed to Assign the SRT to Talisman .........................................18

    **V.**      **Defendants' Shareholder Reliance / Laches / Waiver and Equitable Estoppel Defense** .........................................20

    **VI.**    **Defendants' "Made-Up Claim" "Defense"** ......................................21

**LAW AND ARGUMENT** ..............................................................................................23

    **I.**      **Judgment Should Be Entered in Talisman's Favor on Its Breach of Contract Claims (Counts One and Two)** .........................................23

        A.     Talisman Has Proven that Gunnerman Is Liable for Breach of the TTAA ...........23

        B.     Talisman Is Entitled to Declaratory Judgment, Specific Performance and Damages .........................................28

    **II.**     **Judgment Should Be Entered in Talisman's Favor on Its Implied Duty of Good Faith and Fair Dealing Claim (Count Four)** .........................................34

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

**III.    Judgment Should Be Entered in Talisman's Favor on Its Tortious Interference with Contractual Relations Claim Against SulphCo (Count Five)** ..............................................................................................**36**

    A.    Talisman Has Proven Each of the Elements of Tortious Interference ..................36

    B.    Talisman Is Entitled to Damages, Including Punitive Damages ...........................37

**IV.    Judgment for Talisman Should Be Entered on Its Conversion Claim (Count Six)** ....................................................................................................................**38**

    A.    SulphCo Is Liable for Conversion .........................................................................38

    B.    Talisman Is Entitled to Return of the Property, In Addition to Damages and Punitive Damages ...........................................................................................38

    C.    Judgment Should Be Entered in Talisman's Favor on Its Unjust Enrichment Claim Against SulphCo (Count Seven) ............................................39

**V.    Talisman Is Entitled to An Award of Its Attorneys Fees and Costs** .....................**40**

**CONCLUSION** ........................................................................................................................**40**

**CERTIFICATE OF SERVICE** ..............................................................................................**42**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                            iii

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*Amaysing Tech. Corp. v. CyberAir Comms., Inc.*, 2004 WL 1192602 (Del. Ch. 2004)................30

4

*Anderson v. Del. Dept. of Admin. Servs.*, 1992 WL 183080 (Del. 1992) .........................24

5

*Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574 (Fed. Cir. 1991) ........................32

6

*Bailey v. Butner*, 64 Nev. 1, 176 P.2d 226 (1947) ................................................31

*Bates v. Cottonwood Cove Corp.*, 84 Nev. 388, 441 P.2d 622 (1968) ......................31, 36

7

*Blue Chip Capital Fund II P'ship v. Tubergen*, 906 A.2d 827 (Del. Ch. 2006)...........................35

8

*Buckley v. Terhune*, 441 F.3d 688 (9th Cir. 2006).................................................24

9

*Caldera Properties-Lewes/Rehoboth VII, LLC v. Ridings Dev., LLC*, 2008 WL 3323926
(Del. Super. 2008)..............................................................................23

10

*Carcione v. Clark*, 96 Nev. 808, 618 P.2d 346 (1980) ............................................29

11

*Carlson v. Hallinan*, 925 A.2d 506 (Del. Ch. 2006)..............................................31

12

*Cieniewicz v. Sliwka*, 133 A. 695 (Del. Ch. 1926)...............................................31

13

*Coalition of Clergy v. Bush*, 310 F.3d 1153 (9th Cir. 2002)......................................23

14

*Conner v. Phoenix Steel Corp.*, 249 A.2d 866 (Del. 1969) ......................................26

*Contractors Equip. Maintenance Co., Inc. ex rel. U.S. v. Bechtel Hanford, Inc.*, 514
F.3d 899 (9th Cir. 2008) ......................................................................24

15

16

*Cut Rate Drug Co. v. Scott & Gilbert Co.*, 54 Nev. 407, 20 P.2d 651 (1933)..............................27

17

*DDB Tech. LLLC v. MLB Advanced Media, LP*, 517 F.3d 1284 (Fed. Cir. 2008)........................32

*Derwell Co. v. Apic Inc.*, 278 A.2d 338 (Del. Ch. 1971)........................................30

18

*Donell v. Perpetual Inv., Inc.*, 2007 WL 1723473 (D. Nev. 2007) ..............................20

19

*Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434 (Del. 2005)...............................34

20

*Equitable Trust Co. v. Gallagher*, 102 A.2d 538 (Del Ch. 1954).................................30

21

*Evans v. Dean Witter Reynolds, Inc.*, 116 Nev. 598, 5 P.3d 1043 (2000) ..................38, 39

22

*FilmTec Corp. v. Hydranautics*, 982 F.2d 1546 (Fed. Cir. 1993) ...............................32

23

*Guion v. Terra Mktg of Nev., Inc.*, 90 Nev. 237, 523 P.2d 847 (1974) ........................38

*Harper v. Delaware Valley Broad., Inc.*, 743 F. Supp. 1076 (D. Del. 1990) ..................23

24

*J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 71 P.3d 1264 (2003) .............................36

25

*Kern v. Kern*, 107 Nev. 988, 823 P.2d 275 (1991) ..............................................29

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                           iv

*Koepping v. Tri-County Metro. Transp. Dist. of Oregon*, 120 F.3d 998 (9th Cir. 1997) ...............24

*Las Vegas Fetish & Fantasy Halloween Ball, Inc. v. Ahern Rentals, Inc*., 182 P.3d 764
   (Nev. 2008) .............................................................................................................................20

*LeasePartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 113 Nev. 747, 942
   P.2d 182 (1997)........................................................................................................................39

*Leasing Serv. Corp. v. Hobbs Equip.*, 894 F.2d 1287 (11th Cir. 1990)............................................39

*Lee Builders, Inc. v. Wells*, 92 A.2d 710 (Del. Ch. 1952) .................................................................29

*Magill v. Lewis*, 74 Nev. 381, 333 P.2d 717 (1959) .........................................................................40

*Matulich v. Aegis Comms. Group, Inc.*, 2007 WL 1662667 (Del. Ch. May 31, 2007) ...................24

*Mayfield v. Koroghli*, 124 Nev. 34, 184 P.3d 362 (2008).................................................................29

*McCann v. Paul*, 520 P.2d 610 (1974) .............................................................................................31

*McGraw-Edison Co. v. Preformed Line Prods. Co.*, 362 F.2d 339 (9th Cir. 1966).......................28

*Nevins v. Bryan*, 885 A.2d 233 (Del. Ch. 2005) ........................................................................33, 37

*Patterson v. Hughes Aircraft*, 11 F.3d 948 (9th Cir. 1993) .......................................................23, 29

*Picciotti v. Piccioti*, 1992 WL 510194 (Del. Fam. Ct. Dec. 7, 1992)...........................................26

*Pierce v. Int'l Ins. Co. of Ill.*, 671 A.2d 1361 (Del. 1996)................................................................34

*Progressive Int'l Corp. v. E.I. du Pont de Nemours & Co.*, 2002 WL 1558382 (Del. Ch.
   July 9, 2002) ............................................................................................................................24

*R.M. Williams Co. v. Frabizzio*, 1993 WL 54423 (Del. Super. Feb. 8, 1993)...............................34

*Red Rock Comms., Inc. v. American Telecasting, Inc.*, 2006 WL 2524195 (D. Nev.
   2006) ........................................................................................................................................25

*Sandy Valley Assoc. v. Sky Ranch Estate Owners Assoc.*, 117 Nev. 948, 35 P.3d 964
   (2001)............................................................................................................................33, 34, 37

*Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453 (Del. Ch. Jan. 17, 2008) ..............................24

*Seaford Golf & Country Club v. E.I. du Pont de Nemours & Co.*, 925 A.2d 1255 (Del.
   2007) ........................................................................................................................................26

*Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473 (Del. Ch. Nov. 8, 2007) .......................24

*Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed. Cir. 2000)......................................................32

*Stoltz v. Grimm*, 689 P.2d 927 (Nev. 1984)......................................................................................30

*Summa Corp. v. Greenspun*, 96 Nev. 247, 607 P.2d 569 (1980).....................................................34

*Tomei v. Sharp*, 902 A.2d 757 (Del. Super. 2006)...........................................................................35

*United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810 (Del. Ch. 2007)..................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

*Vaughan v. Creekside Homes, Inc.*, 1994 WL 586832 (Del. Ch. June 17, 1994) ....................29, 34

*VLIW Tech. LLC v. Hewlett-Packard Co.*, 840 A.2d 606 (Del. 2003) ............................................23

*In re Wal-Mart Wage &Hour Employment Practices Litig.*, 490 F. Supp. 2d 1091 (D. Nev. 2007) .......................................................................................................................................39

*Williams v. White Oak Builders, Inc.*, 2006 WL 1668348 (Del. Ch. Feb. 6, 2006).......................34

**STATUTES**

N.R.S. § 42.001 .........................................................................................................................39

N.R.S. § 42.005.....................................................................................................................37, 39

28 U.S.C. § 2201 ........................................................................................................................28

**RULES**

Fed. R. Civ. P. 15(b)(2)..............................................................................................................34

Fed. R. Civ. P. 37(c) ..................................................................................................................34

Fed. R. Civ. P. 54(c) ..................................................................................................................34

Fed. R. Civ. P. 57 .......................................................................................................................28

**OTHER AUTHORITIES**

*Black's Law Dictionary* (8th ed. 2004)......................................................................................27

5 *Corbin on Contracts* §24.22....................................................................................................26

11 *Corbin on Contracts* §55.12 .................................................................................................27

12 *Corbin on Contracts* §1142 ..................................................................................................30

25 *Williston on Contracts* §67.8 ................................................................................................30

30A C.J.S. Equity §102...............................................................................................................20

*Restatement (First) Contracts* §358 ..........................................................................................30

*Restatement (Second) Torts* § 871 .......................................................................................38, 40

5A Charles Alan Wright, *Federal Practice and Procedure* § 1310 ...............................................34

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

1

2

3

Plaintiff, Talisman Capital Talon Fund, Ltd. ("Talisman"), by and through undersigned counsel, submits this Post-Trial Brief in accordance with the Court's January 5, 2008 Order (Doc. #272).

4

## STATEMENT OF FACTS

5

6

7

8

9

10

11

12

The central witness of the trial, Rudolf Gunnerman, spoke first.  During the first few hours of his testimony, Talisman proved virtually every element of its claims.  And when Gunnerman stubbornly refused to admit the truth, he lacked credibility, whereas other witnesses proved these facts convincingly.  The trial testimony and admitted exhibits, summarized below, establish that a valid contract required Gunnerman and SulphCo to turn over property that is not legally theirs and that Gunnerman has not performed his obligations under that contract.  Talisman asks this Court to remedy that wrong.

13

## I.   Overview of the Case

14

15

16

17

18

19

20

This case arises out of an April 2003 transaction that both SulphCo, Inc. ("SulphCo"), and Clean Fuels Technology, Inc. ("CFT"), needed for their very survival.  On the one hand, in early 2003 SulphCo, whose primary financier, CEO, and Board chairman was Rudolf Gunnerman, needed substantial capital in order to continue the company's operations.  (1 Tr. 239:12-240:7, 7 Tr. 1598:20-1600:17).[1]  On the other hand, CFT was seeking an investor to keep it afloat.  (3 Tr. 693:8-12).  The parties had a mutual interest and motivation to come to a deal.

21

22

23

CFT's situation was not far different in 1998, when Gunnerman first discovered the sulfur reduction technology ("SRT").  At that time, Gunnerman was a CFT director, its chairman and a

24

25

---

[1] At that time SulphCo had only approximately $36,000 on hand but was spending funds at the rate of $250,000 monthly.  Gunnerman had extended SulphCo a line of credit and had made a pledge to infuse $1.655 million into SulphCo by May 13, 2003, approximately three weeks after he obtained $2 million in the April 2003 Capital Strategies transactions.  (D-81; 1 Tr. 239:12-240:7; 7 Tr. 1598:20-1600:17).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}

major stockholder.  However, CFTs balance sheet was unattractive, and Gunnerman had every incentive to strike out on his own.  So, soon after discovering the SRT opportunity, Gunnerman secreted the SRT away and developed it in a completely new business, which became defendant SulphCo.  This scheme threatened to miscarry, however, when Gunnerman was unable to obtain the CFT board's required approval for what he had done.  In the end, Gunnerman entered a side agreement with CFT's CEO Tom Harvey to obtain CFT board approval on the basis of materially misleading facts, thus purportedly enabling Gunnerman to take the SRT away from CFT.  Again, however, board approval did not occur.  Around that same time Gunnerman was busily developing the SRT, even using CFT's lawyer Henry Heines (without CFT's approval) to prepare and file a patent application, which Gunnerman promptly deposited into SulphCo in exchange for nearly complete control of SulphCo.

Gunnerman never made full disclosure to his fellow CFT officers and directors – about how he discovered the SRT at CFT's expense or how he always believed that it was a "natural fit" with CFT's products.  On the contrary, Gunnerman constructed a web of deceits, which succeeded in hiding the truth from CFT, to make his scheme work.

When, in 2003, Gunnerman was approached to sell his underlying licensor position to Capital Strategies, the deceit was nearly complete.  He retained the same CFT lawyers – Heines and his firm – to help him do it.  The resulting agreements, however, fail to perfect Gunnerman's fraud on CFT and Capital Strategies.

II.     The TTAA

A.     The TTAA Is Valid.

The parties stipulated that the resulting April 2003 Technology Transfer and Assignment Agreement, as amended in December 2004 (the "TTAA"), comprises a valid, enforceable contract

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                - 2 -

between the parties, Gunnerman and Capital Strategies. (*See* 1 Tr. 230:6-9; Pretrial Order (Doc. #168) at 3 (Admitted Fact no. 4: "The TTAA, as amended, is valid and effective.")). This stipulation forecloses Defendants' eleventh-hour shift in position that the 2004 amendment resulted from trickery. (*See, e.g.*, 10 Tr. 2412). Among other things, the amendment specifies that it "clarifies" the TTAA and permits Capital Strategies' assignment of all rights under the TTAA to Talisman. (P-24 at 1, 2-3).[2] Talisman, therefore, has clear interest and standing to enforce rights pursuant to this admittedly valid contract.

**B.     The TTAA Conveyed Specifically Defined Intellectual Property Related to the "Field" of the 1994 Exclusive License Agreement**

**1.     The words of the TTAA**

The TTAA includes an assignment of all of Gunnerman's "present and future right, title and interest in and to" specified property, including ideas and know-how that he may have discovered or thought of after the April 2003 date of the TTAA. The "clarifying" 2004 amendment does not change the assignment; rather, by its terms it clarifies the conveyance provision (Section 2.1) by: (i) providing that *any* technology related to the "Field" was being transferred; (ii) adding references to "aqueous or fuel/oil based emulsions"; and (iii) specifically assigning "technical information and know-how … that *relates to the **Field***, including all know-how "that relates to aqueous or fuel/oil based emulsions" and "all license agreements, including the Exclusive License." (P-24 at 2, §2.1(iv)-(v) (emphasis added)).

Gunnerman also warranted that he "owns, and has the unrestricted right to assign and transfer, the Intellectual Property Rights pursuant to the terms of this Agreement, free and clear of

---

[2] A prior version of the amendment, which Gunnerman signed, identified Talisman as the contemplated assignee, and Gunnerman acknowledged and assented to the adequacy of the stated nominal consideration of $1.00. (P-22 at 5). Regardless, Defendants lack standing to question the sufficiency of the consideration Talisman paid to acquire its rights in the TTAA. *See infra* note 19.

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                    - 3 -

all Encumbrances" and that he had not "granted any person or entity any rights, license, sublicense or other agreement or otherwise, to use the Intellectual Property Rights, other than pursuant to the Exclusive license."  (P-18, §3.3(a)).  At trial Gunnerman acknowledged the continuing obligation he voluntarily assumed under the TTAA.  (1 Tr. 232:18-24).

### 2.    The TTAA reference to ELA definition of "Field"

The definition of the term "Field" derives from the 1994 Exclusive License Agreement ("ELA").  (P-2, §1.1).  The ELA provides in part that "Field" encompasses:

> (b)    aqueous fuels, including fuels described in the Patents, as well as (i) methods, processes, apparatuses and compositions for their production and (ii) methods, processes compositions and apparatuses for their combustion; and

> (c)    methods, processes, compositions and apparatuses used for production of chemicals, petrochemicals, plastics or pharmaceuticals utilized in connection with any of the above.

(P-2, ¶1.1).  At trial Gunnerman agreed that this definition was last amended in 2001.  (1 Tr. 108:16-18;  *see also* Doc. #15 at 3 (Defendants' Answer describing ELA "and its four amendments," the latest of which is dated 2001)).  Consequently, the definition and meaning of "Field" has not changed since 2001; the same definition applied in April 2003 and December 2004.[3]

### 3.    Gunnerman's and SulphCo's legal team blessed the TTAA

In the 2003 TTAA transaction, Defendants' legal team included attorney Kirk Schumacher (who was also defendant SulphCo's president), Henry Heines, Ph.D. (Gunnerman's trusted patent lawyer), and Joel Ackerman.  Ackerman practiced with Heines in the law firm Townsend &

---

[3]  The definition of "Field" was not amended after 1998; however, Defendants have previously contended that "agreements between the parties" (Capital Strategies and Gunnerman) after 1998 effected one or more amendments to the ELA definition.  (*See* P-260 at 3 (no. 2); P-262 at 4 (no. 4)).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                    - 4 -

Townsend & Crew of San Francisco. (8 Tr. 2034:15-18). Conveniently for SulphCo and Gunnerman, Heines and his firm were also well-versed in the technology of Gunnerman's former company, CFT, which Heines and his firm also represented. (8 Tr. 2063:14-16; 9 Tr. 2091:9-13; 9 Tr. 2110:11). In 2004 Gunnerman's legal team expanded to include even more lawyers, who helped craft the language of the amendment Gunnerman signed and has admitted is valid. (1 Tr. 225, 229; 8 Tr. 2045:11-15).

### III.     The SRT Falls Within the "Field" of the TTAA

The trial evidence confirmed that sulphur reduction technology falls squarely within  the ELA "Field" definition. First, Gunnerman agreed that the SRT falls within the term "petrochemicals" as used in subpart (c) of the ELA definition of "Field." (1 Tr. 113:5-14). Therefore, to quote from the "Field" definition, the SRT would come within the definition if it were "utilized in connection with any of the above," *i.e.*, "aqueous fuels, including  . . ." as set forth in subpart (b) of the definition. But Gunnerman steadfastly refused to admit that an oil-in-water emulsion, which is critical to the aqueous fuel production process, was also essential to SRT. Over and over Gunnerman clung to the line that he had taken with his fellow CFT officers and directors, *viz.*, that the SRT did not involve any process related to emulsions and bore no relationship to aqueous fuels or the method of producing them. (*See* 1 Tr. 179:13-18; 1 Tr. 199:2-14, 200:12-14, 202:8-11; 1 Tr. 199:19-200:2).

At trial, however, Gunnerman's position was conclusively contradicted by the testimony of three Ph.D.s.[4] Two of them, T. F. Yen, Ph.D., the inventor of ultrasound-assisted SRT, and

---

[4] Gunnerman does not hold a Ph.D. His credibility was shattered when he admitted that he had previously given sworn testimony that he held such a degree from the University of Southern California, ironically the same institution where Professor Yen is on faculty. (1 Tr. 96:23-97:3). Contrary to his claim of holding a Ph.D. from the institution, Gunnerman admitted he had never attended even a single course at USC. (1 Tr. 97:13-21).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}

plaintiff's expert James Speight, Ph.D., settled this scientific issue.   The testimony of Henry

Heines, J.D., Ph.D., Defendants' own witness and attorney, corroborated their testimony.

Tellingly, Defendants did not call an expert to testify, despite listing *two* persons to give expert

scientific testimony in the Pretrial Order (Doc. #168 at 75 (listing Spencer Taylor, Ph.D., and

George Mushrush, Ph.D.)), and one (Mushrush) in their trial witness listing just days before the

trial commenced.  (Doc. #254 at 1).

*Professor Yen.*  Professor Yen, who invented the technology laid out in the '939 Patent (P-

121; 6 Tr. 1427:2-1428:17), testified that an oil-in-water emulsion was in fact an essential step in

the process and, further, that it created an aqueous fuel.  (6 Tr. 1457:7-25; *see also* 6 Tr. 1463:9-

12, 1471:17-1473:24).   Professor Yen also testified that his invention was related to fuels and

petrochemicals.   (6 Tr. 1474:16-1475:16).   Thus, Professor Yen – who (better than anyone

including Gunnerman) is in a position to know exactly what SRT is and what it is not – placed his

ultrasound-assisted SRT invention squarely within the ELA Field.

*Dr. Speight.*  The Court heard from only one expert witness, Dr. James Speight, qualified

in the field of petroleum technology.  (6 Tr. 1239).  After examining each of the SRT-related

patents and patent applications, Dr. Speight concluded that this technology lies within the ELA

Field Gunnerman transferred pursuant to the TTAA.  (6 Tr. 1240:18-19).  Dr. Speight explained

precisely why he reached this conclusion:

>  . . .  Aqueous fuels are covered by the exclusive license agreement; The processes
> for producing aqueous fuels are covered by the exclusive license agreement;
> SulphCo's process involves aqueous fuel; SulphCo's process involves the
> production of an aqueous fuel; And the processes and products covered by the
> exclusive license agreement are incorporated into the technology transfer and
> assignment agreement.

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

1   (6 Tr. 1240:20-1241:7).  Dr. Speight's conclusion applies to *all* of the Gunnerman SRT, as he

2   testified that each specific patent or application described technology that fell within the "Field."

3   (6 Tr. 1306:13-1307:23).[5]

4       Dr. Speight's independent analysis, like Professor Yen's testimony, flatly contradicts

5   Defendants' self-serving, false description of the SRT.  (*See* Defs. Pre-Trial Br. (Doc. # 211) at 5;

6   1 Tr. 53:21-54:5).  For instance, while Defendants contended that the SRT never utilized refined

7   fuels (*id.*), did not involve the use of emulsion stabilizers called "surfactants" (2 Tr. 359:7-21,

8   361:11-15), and sustained the oil-in-water emulsion state for only "hundredths" or "thousandths"

9   of a second (1 Tr. 197, 198, 203:9-11, 212:1-4; 2 Tr. 295), Dr. Speight highlighted the patent

10  provisions that said, in each instance, precisely the opposite.  (*See* 6 Tr. 1262:18 (surfactants); 6

11  Tr. 1264:17 (refined products); 6 Tr. 1252:2-1253:3 (duration of emulsion)).  Dr. Speight's expert

12  testimony on these crucial points makes Defendants' election not to call their listed expert

13  inexplicable.  In fact, rather than attempt to rebut Dr. Speight's findings, Defendants tried to

14  characterize them as "irrelevant."  (10 Tr. 2395:18 2400:8; *see also* 8 Tr. 2077:7-8).

15      Dr. Speight highlighted the fact that, via sworn declarations (*e.g.*, P-290), Gunnerman

16  approved and certified the accuracy of the various SRT patents and applications.  As a result,

17  Gunnerman could not hide behind the excuse of not having read them (2 Tr. 263:9-15); nor could

18  he contend that Heines had done a poor job drafting them (*id.*).  Of course, Gunnerman admitted

19  that he had given Heines his full power of agency.  (2 Tr. 357:16-23).

20      The patent documents themselves establish that the SRT falls within the Field.  Not only

21  did the Yen Patent teach the use of emulsified fuels (*see* P-108 at 4-11; P-121 at 7-9),[6] subsequent

---

[5] *See also* 6 Tr. 1246:19-25, 1261:20-1262:1 ('939 Patent, P-121), 1270:19-1271:6 ('219 Patent, P-124); 1273:23-1274:9 ('992 Patent, P-131), 1278:9-16 ('844 Patent, P-287), 1278:25-1279:25 ('628 Patent, P-135), 1286:23-1287:6 ('566 Patent, P-302), 1291:6-12 ('500 patent application, P-315), 1296:16-1298:2 ('055 patent application, P-343).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

SRT process patents also state the relationship.  (*See* P-124 ('219 patent) at 2, 4; P-127 ('988 application) at 13; P-134 ('844 patent) at 2; P-136 ('566 patent) at 1; P-302 ('566 patent) at 2). Finally, most of these patents also cited as prior art certain patents, including the "Gregoli patents," that expressly fall within the field of oil-in-water emulsions.  (*See, e.g.*, P-330 ('287 patent); P-329 ('365 patent); and P-327 ('443 patent)).

The ultrasound-making "apparatus patents" incorporate prior SRT patents and state that they are particularly useful when applied to SRT processes, including Yen's process for making aqueous fuel.  (*See* P-131 ('992 patent) at 6; P-135 ('628 patent) at 9; P-137 ('600 application) at 5; P-315 ('500 application) at 2; P-307 ('400 application) at 7; P-311 ('440 patent) at 9; P-343 at 3; P-322 ('915 application) at 4).

***Henry Heines.***  Besides Gunnerman, the only defense witness who discussed the nature of the SRT was Heines, Defendants' longtime patent lawyer.  Heines stated his belief that SRT fell within the "field of aqueous emulsions" (P-215 at 2), and that oil-in-water emulsions were critical to the SRT.  (*See, e.g.*, P-288 at 1).  These admissions are all the more telling because it was Heines who helped negotiate Gunnerman's successive attempts to separate from CFT – which was also Heines's client (8 Tr. 2029:22- 2031:7; 2054:18-2056:4; 2063:7-2064:20) – and which, when CFT learned the truth, laid claim to the SRT.  (*See* D-215).

Talisman urges the Court to assign due significance to the circumstances surrounding Heines's critical admission that the SRT overlapped with the Field.  First, and contrary to Defendants' suggestion, Heines made the admission in a confidential attorney-client

---

[6] Professor Yen's interim research reports, which were first discovered in 2005 (7 Tr. 1729:5-14), also show that SRT falls within the field.  (*See* P-96 at 2-3; P-97 at 6-7, 12; P-99 at 13; P-100 at 2; P-101 at 23; P-102 at 4, 7, 10; P-103 at 3, 5, 8; P-104 at 3; P-105 at 10, 17, 21; P-109 at 7).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89502

communication, not intended for Defendants' eyes.  (1 Tr. 227:8-25).[7]  Second, prior to admitting

the fact of the scientific overlap, Heines deliberately put himself into an irreconcilable conflict and

proceeded to favor SulphCo and Gunnerman over CFT, also his client.  (8 Tr. 2053:7-8, 2055:17-

24).[8]  These circumstances, combined with Gunnerman's repeated insistence that the SRT does

*not* relate to the Field, further underscore the absurdity of Defendants' contention that Capital

Strategies and CFT had a full understanding of the nature of the SRT in 2003.

## IV.    Interpretation of the TTAA

Confronted with emphatically adverse and uncontroverted expert testimony regarding the

scope of TTAA "Field," Defendants nonetheless sought to call into question the scope of the

TTAA "Field" on two fronts:

- First, they introduced extrinsic evidence of the "parties' intent" not only as to the meaning of "Field," but as to non-scientists' view of that term, even though they and their counsel, Messrs. Heines and Ackerman: (i) had no information as to Capital Strategies' intent, and (ii) held exclusive knowledge of critical information as to the nature and scope of the SRT (9 Tr. 2139:10-19, 2140:6-15, 2147:17-22); and

- Second, Defendants asserted that the negotiated language of the TTAA was somehow inconsequential in light of the purported approvals Rudolf Gunnerman had obtained from CFT, the company whose board he chaired, to pursue SulphCo's intellectual property.

As  discussed  above,  Gunnerman  had  SulphCo's  and  his  own  counsel  assist  him  in

negotiating the TTAA.  At the same time, he was acting as CFT's Board Chairman and consultant

at $400,000 annually.  (D-12 at 1; 1 Tr. 243:5-20).  Likewise, in 2004 when Gunnerman agreed to

amend the TTAA in part to "clarify" the description of the property he agreed to convey to Capital

---

[7] It is unknown whether Gunnerman's counsel later forwarded the Heines email to Defendants through inadvertence. John Volney, who forwarded the email, enrolled as Gunnerman's counsel and did not testify.

[8] Heines clearly admitted that he represented Gunnerman in negotiating his consulting agreement with CFT, without informing CFT he was doing so.  *Id.*  This enabled Heines to play a critical role in helping Gunnerman spirit away the SRT to SulphCo.

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}

1    Strategies, he was again assisted by his and SulphCo's counsel.  (1 Tr. 225:22-226:23, 229:2-19; 8
2    Tr. 2041-2042).

3         Gunnerman admitted *both* that he enjoyed superior knowledge of the science and that he
4    repeatedly represented to CFT directors that the SulphCo SRT, as it existed from 1998 to 2003,
5    bore no relationship whatsoever to fuel emulsion technology.  (P-144; 1 Tr. 125:2-21, 128:8-21,
6    149:24-150:3, 150:13-150:16, 168:12-18; 2 Tr. 253:14-19, 267:7-11, 384:2-9).  The trial transcript
7    contains countless references to Gunnerman's denials of the fact that emulsions played a key part
8    in the processes for SRT.

9         Plaintiff established, with uncontroverted factual evidence, that Gunnerman's
10   representations were false and were made for the specific purpose of concealing an overlap
11   between the SRT and the fuel emulsion technology pursued by CFT.  That is, the uncontroverted
12   evidence established that the "science" of SRT did, in fact, directly relate to petrochemicals and to
13   the process for producing aqueous emulsion fuels, as set forth in the ELA.  As discussed below,
14   however, the extrinsic evidence that Defendants have adduced bears analytically only on the issue
15   of the TTAA's validity, which Defendants have stipulated and are legally bound to accept.

16        A.    **April 2003 Communications Support Plaintiff's Interpretation**

17        If other April 2003 communications, including agreements between Gunnerman and CFT,
18   are considered in determining the scope of the TTAA, Defendants' argument requires the Court to
19   ignore crucial facts.   First, during the negotiations, Gunnerman's and SulphCo's attorneys
20   proposed language for the TTAA that would exclude the "SulphCo Field" from the ELA
21   definition of "Field" and that proposed Gunnerman give no warranties in the TTAA.  (P-196, P-

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                 - 10 -

197; 5 Tr. 1004:13-16).[9]   As Klaich and Zalk testified, however, these changes were rejected.   (3 Tr. 511:10-515:17; 5 Tr. 1005:9-15; *see* P-200).   Thus, the Termination and Release provided only that the term "Field" *as used in the Consulting Agreement* does not include the "SulphCo Field." (D-73 at 2, §1(b)).   The Termination and Release nowhere refers to the ELA.

Attorney Zalk testified that Capital Strategies derived the most comfort and protection from the warranties that Capital Strategies insisted Gunnerman give in the TTAA.   (*See* P-18 at 4, ¶ 3.3(a); 5 Tr. 1005:16-18).   According to Zalk, the warranties represented "confirmation from the seller that they own what they're selling and that they can do it and that it's not encumbered ...." (5 Tr. 1007:20-1008:5).   As a result, Capital Strategies rejected Ackerman's attempt to remove these warranties or to redefine "Field."   (4 Tr. 959:9-19; 967:22-968:20; 5 Tr. 1003:12-1005:18).

**B.      The Two Parties to the TTAA Intended That the ELA Field Would Be Conveyed**

If the contract language were somehow unclear, Michael Zalk and Rudolf Gunnerman both testified that it was the parties' shared intent to transfer *all* technology within the Field, without exception.   Asked what he thought was being conveyed, Zalk replied:

> All of the intellectual property rights that are defined in that agreement.   …   So what the agreement ended up saying as executed is what was being conveyed. …

> . . . [M]y understanding was Capital Strategies was acquiring whatever rights Mr. Gunnerman had under the exclusive license.   And there were important reasons why we thought he had continuing rights under that agreement that were valuable to acquire, and to the extent those rights extended to whatever is included in the field, they were being transferred.

---

[9] Defendants mischaracterized Ackerman's attempt in this regard as a "drafting approach" and not a proposal to amend the ELA.   (Def. Pre-Trial Br. (Doc. #211) at 13 n.1).   Ackerman's letter could not be clearer, however, that he wished to redefine the ELA "Field."   Of course, if Ackerman's letter was not clear, his testimony presumably would have allayed any confusion.   As with Mushrush, however, Ackerman did not take the stand despite Defendants' pledge that he would (8 Tr. 2024:12, 2072:24), and despite Heines's December 11 testimony that Ackerman was present in Reno preparing to testify.   (9 Tr. 2112:17-20).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                   - 11 -

(4 Tr. 981:16-982:3; 4 Tr. 988:15-989:6; *see also* 4 Tr. 986:7-24; 5 Tr. 998:21-1000:16).[10]

Gunnerman, likewise, testified that his "intent" was that the "science" of the ELA Field was conveyed in the TTAA.  (2 Tr. 352:5-8 (stating that he intended to convey everything set forth in the ELA Field); 1 Tr. 103:17-24 (aqueous fuel is emulsion of water, oil, surfactant)).

**C.    Contrary Intent Was Not Expressed Through The Termination And Release Agreement**

Even in the face of evidence that their attempt to redefine "Field" in the ELA was rejected, Defendants have strenuously urged the Court to rewrite the TTAA on the basis of provisions of the Termination and Release Agreement.  But this argument asks the Court to distort not only the meaning of the TTAA but also of the Termination and Release.

First, the parties appear to agree that the Termination and Release does not amend the ELA's definition of "Field."  *See supra* at p. 4.  Further, the Consulting Agreement, which the Termination and Release terminated, expressly states that its provisions "are supplementary to and do not in any way supersede, limit, modify or expand [Gunnerman's] rights or obligations under the ELA."  (D-12 at 2, ¶8).

Second, the Termination and Release's limitation of the term "Field" is inextricably connected to Gunnerman's representations regarding the SRT opportunity, which have turned out to be false.  Specifically, in the Termination and Release Gunnerman represented the following:

> In 2000 Dr. Gunnerman made a presentation regarding the SulphCo technology to the Clean Fuels board.  He stated (1) that the SulphCo technology was separate and distinct from the Clean Fuels technology; (2) that the SulphCo technology had been developed exclusively with his independent resources and not utilizing any resources of Clean Fuels; and therefore (3) the SulphCo technology did not present

[10] In an attempt to discount Zalk's clear testimony, Defendants suggested that Zalk was speaking for himself, not for his client, Capital Strategies. Zalk made clear, however, that he took direction from his client and was testifying as to its intentions. (5 Tr. 1153:12-23).

ROBISON, BELAUSTEGUI, SHARP & LOW
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                    - 12 -

a corporate opportunity to Clean Fuels.   Relying on those representations, the independent directors of the Board agreed that he could independently pursue it.

(D-73 at 2).  As Capital Strategies' attorney Zalk testified, Capital Strategies believed Gunnerman when he represented that the SRT was not a corporate opportunity of CFT, and that proper steps had been taken to allow Gunnerman to pursue the opportunity.  (5 Tr. 1008:1-5).  Zalk also testified that the "Acknowledgment" provided by CFT's then-president Carlos Duno, with his Board chairman's knowledge and approval, gave Capital Strategies the reassurance that Gunnerman had acted appropriately.  (5 Tr. 1137:9-16; P-18 at 10).

As one Nevada jury has already determined, and as Gunnerman himself knew, this was false.  (*See* D-215; 1 Tr. 102:2-10).  CFT's Klaich testified that during the rushed negotiations of the April 2003 transactions he only achieved comfort with his understanding of events after he reached a verbal agreement with SulphCo's Schumacher to reserve all rights as to the corporate opportunity and similar issues.   (3 Tr. 514:3-17, 529:10-530:10;  530:14-22; P-202; P-203).  Schumacher, after some prodding, admitted that Klaich's recollection was truthful.  (4 Tr. 909:1-10, 910:2-23).   Schumacher even agreed that without CFT's or Capital Strategies' releasing of Gunnerman, ownership claims were left unresolved and "open for future resolution."   (4 Tr. 930:18-932:8, 933:24-934:5).   Because Schumacher, acting as SulphCo's and Gunnerman's attorney, admitted that Defendants reserved issues of ownership for a later date, Defendants cannot now argue that they relied on any "Acknowledgment" by CFT's Carlos Duno that Gunnerman had *not* breached the ELA. (1 Tr. 66:15-22).[11]

Most importantly, the trial testimony clearly established that Gunnerman's representations in the Termination and Release were, and remain, false:

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

---

[11] In any event, Defendants' claimed reliance on the "Acknowledgment" is nullified by Duno's sworn affidavit to the effect that he had no knowledge about the SRT and SulphCo's technology or processes.  (P-220 at 1).

{N1940177.4}                                    - 13 -

(1)     the SulphCo technology was *not* scientifically separate and distinct from the Clean Fuels technology, and in fact SRT sprung from the same seed of oil-in-water emulsion;

(2)     the SRT had *not* been developed exclusively with Gunnerman's independent resources; instead Gunnerman admitted and other witnesses testified that CFT resources were used to find Yen and SRT (P-248; 1 Tr. 135:19-24; 152:4-11; 153:17-154:15; 2 Tr. 300:4-9; 4 Tr. 754:2-25; 759:2-760:3; 6 Tr. 1417:14-1419:2.);

(3)     the SulphCo technology did, in fact, present a corporate opportunity to Clean Fuels, although Gunnerman claimed otherwise;

(4)     the CFT Board's "independent directors" did not vote to grant Gunnerman the "corporate opportunity" of the SRT and in fact no board approval was ever obtained.   1 Tr. 168:12-169:1; 172:2-13; 2 Tr. 428:12-429:1; 429:15-19; 430:13-21; 433:18-22; 5 Tr. 1188:2-9; 1190:4-1191:18.

Other than Gunnerman himself (and perhaps Heines), no one knew these facts in the spring of 2003.   It was not until 18 months later that CFT's officers came to the realization that Gunnerman had *never* obtained board approval for his actions taking the SRT from CFT and that Gunnerman had assigned it to SulphCo.  (4 Tr. 763:16-765:21).   Moreover, despite Defendants' claims that Capital Strategies was fully conversant with SuphCo's technology in 2003, Defendant Gunnerman himself argued that SRT bore no relationship to oil-in-water emulsions; he went so far as to say that the '939 and other patents are simply wrong.  (1 Tr. 199:2-200:2, 200:12-14, 202:8-11).

Subsequently, in 2005 CFT discovered documents in a locked file cabinet in Peter Gunnerman's office which further confirmed that the SRT did indeed fall under the ELA.  (7 Tr. 1727:7–1728:8).   These documents included the multiple Yen research reports, as well as a copy of December 1998 letters from Peter Gunnerman to Yen stating, *inter alia*, that the SRT was a "natural fit" with CFT's business model.  (7 Tr. 1736:12-1737:5).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                              - 14 -

Bearing heavily on this issue of the parties' "intent" to exclude the SulphCo technology is the testimony of CFT board members such as Rodman Drake, a highly experienced and sophisticated investor, who testified that Gunnerman told the board falsehoods and omitted to disclose key facts. Specifically, Drake confirmed that Gunnerman told the Board that the technologies of the ELA (CFT) and SRT were unrelated. (5 Tr. 1192:4-18). Drake also said that Gunnerman neglected to report to the audit committee regarding the opportunity, as the Board had directed (5 Tr. 1194:4-1194:12, 1205:5-10), and that Gunnerman failed to disclose that he had learned of SRT on CFT time, at its expense, while acting as a CFT officer, facts that Drake considered important. (5 Tr. 1193:7-1194:3, 1196:18-1198:1; P-40).

Gunnerman even admitted this fact. He testified that he believed board approval was required under the November 28, 2000, agreement (P-12, ¶1; 1 Tr. 182:13-24), but he could not confirm that Board approval occurred or that he made any meaningful disclosure at board meetings. (*See, e.g.*, 1 Tr. 187:12-14; 1 Tr. 172:14-19; P-36; 1 Tr. 173:18-174:20). Nevertheless, Gunnerman misrepresented to CFT consultant and GRD investor Alex Paior that he *had* sought and obtained Board approval to pursue the SRT opportunity. (1 Tr. 146:19-25).

Defendants' pre-trial claim that Gunnerman "never hid his dealings with Dr. Yen from CFT" (Pretrial Order (Doc. #168) at 15) is simply false. At trial Gunnerman admitted that, less than 30 days agreeing with Professor Yen about a perceived "natural fit" between CFT's technology and SRT (P-142; 1 Tr. 132:14-17, 134:5-7, 141:5-7), he wrote Tom Harvey and stated that the Yen finding was "completely separate and apart from" CFT, and that he had not "in any

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                              - 15 -

1    way" involved CFT or its resources.  (P-144; 1 Tr. 150:17-151:1).[12]  In fact, Gunnerman never

2    came clean with CFT.[13]

3         Gunnerman's pattern of deceit directly impacted the parties' collective state of mind during

4    the spring 2003 negotiations, when Gunnerman perpetuated his scheme in the language of the

5    Termination and Release agreement.  (D-73 at 2 ("SulphCo technology was separate and distinct,"

6    "developed … not utilizing any resources of" CFT, "did not present a corporate opportunity to

7    [CFT]", and "[r]elying on those representations, the independent directors of the Board agreed that

8    he could independently pursue it ….")).  Finally, independent director Drake also stated that he

9    never voted or otherwise agreed to allow Gunnerman to pursue the SRT opportunity, and no

10   consent document bears Drake's (or other independent directors') signature.  (D-11; 5 Tr.

11   
12   1210:11-15, 1215:25-1216:14).[14]

13        **D.    Contrary Intent Was Not Expressed by the Absence of the SulphCo Patents
14              From the TTAA Appendix**

15        At trial, Defendants made much of the fact that the parties had not included SulphCo

16   patents in the TTAA-attached "patent listing" exhibit.  (*See, e.g.*, 12 Tr. 2420).  The reference to

17   the exhibit list in the TTAA, however, expressly states that it is nonexclusive.  (P-18 at 2; 4 Tr.

18   

19   ---

[12] Gunnerman claimed that the meeting was about emulsion stabilizers, but he has no written proof of this, and the paper trail does not support this claim.  (1 Tr. 151:17-20).

[13] Gunnerman glibly stated that he selectively gave CFT officers and directors what information he chose, irrespective of his fiduciary obligations.  (*See* 1 Tr. 134:15-17, 156:17-23, 158:3-8, 158:15-159:11, 161:3-13 (Gunnerman did not provide the December 1998 "natural fit" letters (P-142, P-143) to CFT's board or other officers because he deemed them unimportant and "meaningless"); 1 Tr. 142:23-143:5 (Gunnerman and Yen entered into a "secrecy agreement" (P-7)); 1 Tr. 154:6-15 (admitting that he had the initial draft research agreement altered to delete CFT's (then A-55) name to instead to reflect transfer of the SRT opportunity to GRD); 1 Tr. 163:8-22 (did not provide a copy of either the draft or the final research agreement to board, it was "not their business"); 1 Tr. 149:24-150:7, 150:13-16 (continued to tell CFT board that the technologies were unrelated); 2 Tr. 253:14-19, 267:7-11 (did not tell CFT that the SRT involved oil-in-water emulsions:  "[t]o me that was not important"); P-181; 2 Tr. 267:20-24, 268:20-269:1 (knew that CFT shareholders weren't being told the truth – shareholder letter "speaks for itself" – with information he provided); 1 Tr. 168:12-21, 194:9-11 ('939 patent filing his "personal business")).

[14] Independent director Sen. Robert Dole testified that he did not receive the "unanimous written consent," and thus is confident he did not sign it.  (*See also* 6 Tr. 1505:16-1507:7).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

992:18-25; 5 Tr. 998:21-999:20).  Plaintiff, meanwhile, does not contend that the parties merely inadvertently failed to list the SulphCo patents.  Quite the contrary is true.  In the April 2003 transactions Gunnerman's fraud on CFT was almost fully perfected, and, as Gunnerman saw it, Capital Strategies was to be the victim of necessary collateral damage.

The uncontested facts showed that only Rudolf Gunnerman was fully aware at the time he signed the TTAA that he had developed and was continuing to develop an ELA-overlapping technology at SulphCo without making full disclosure to CFT or to Capital Strategies.  As far as Gunnerman was concerned, the fix was in.  Thus, in April 2003 Gunnerman was still maintaining, as he did in Court, the false positions: that the SRT bore no relationship to the process for making aqueous fuels; that he had fully disclosed everything, including this false fact, to CFT's board; and that it had given him its blessing.  (1 Tr. 99:20-23).  By this time, five years after discovering ultrasound-assisted SRT on CFT time, Gunnerman still had not told the truth.

Defendants focused on Capital Strategies' alleged "negligence" in not "going behind" Gunnerman's representations or by not independently exploring the SulphCo IP to determine its connection to the ELA Field.  Defendants suggested that the parties were naïve to rely on the CFT Board chairman when he told them that the SRT "did not present a corporate opportunity to CFT" and other statements later exposed as false.  (*See, e.g.*, 5 Tr. 1083:7-9 (suggesting that Zalk should have retained patent lawyers to conduct diligence into Gunnerman's representations)).  But, as Klaich and Zalk both testified, they relied on the CFT chairman to tell the truth.  (3 Tr. 562:1-2 (Klaich: "I thought Rudy was telling me the truth.")).  Of course, Capital Strategies fully protected itself by specifically negotiating for, and obtaining, Gunnerman's broad representations and warranty.

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                    - 17 -

### E.    Defendants' Case On "Intent" Cannot Be Reconciled With Gunnerman's Testimony

In the final analysis, Defendants' twists and turns of logic are utterly irreconcilable with Rudolf Gunnerman's own testimony.   Throughout the trial Defendants' counsel strenuously propounded a theory of the case that is completely at odds with what the Court heard out of Gunnerman's own mouth.   It was as if Defendants wished the Court to believe that Gunnerman had not testified at all.   In every material respect, Defendants diverged from Gunnerman's testimony regarding key issues of science and fiduciary duty, instead conceding that the SRT likely does fall within the ELA Field, but then arguing that Capital Strategies knew that and forfeited any claim to it.  (10 Tr. 2397:23-25).  Moreover, even though Gunnerman disagreed with Heines's statement that SulphCo's technology was in the "field of aqueous emulsions" (2 Tr. 272:16-18), Defendants attempted to stand on the highly dubious proposition that Heines's use of the phrase somehow differs from its use in the TTAA.  (9 Tr. 2148:25-2149:7).[15]

### F.    In Violation of His Representations and Warranties, Gunnerman Failed to Assign the SRT to Talisman

Gunnerman's breach of his representations and warranties was clearly established at trial. Beginning with the '939 (Yen) Patent, however, Gunnerman has assigned every patent and patent application of which he is the inventor or co-inventor not to Capital Strategies or to Talisman, but to SulphCo.  (*See* P-118, P-122, P-123, P-128, P-129).   After examining all of the SulphCo-assigned intellectual property, Dr. Speight explained how it fits squarely within the ELA (and

---

[15] Defendants' propensity for double-talk also infected the testimony of Gunnerman's son (and former SulphCo president) Peter.  Peter admitted that he did not share the "natural fit" and similar pre-GRD letters with fellow CFT officers and directors, but then attempted to explain that they simply should not be read to say what they clearly do say.  (4 Tr. 821:12-822:12, 825:5-826:6, 827:6-12).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                    - 18 -

therefore TTAA) Field.   (*See* Section III, *supra*.).   As discussed above, Defendants did not discredit him.

Rather, Defendants contended that the Termination and Release indicated (albeit indirectly) that the '939 Patent was previously assigned to SulphCo, thus allegedly putting Capital Strategies on notice that Gunnerman had no rights to it.   Defendants' nonsensical argument that Capital would be "on notice" of the assignment of the '939 Patent conveniently ignores that while the patent's inventor is Yen, SulphCo failed to advise Capital that *Gunnerman* fully controlled the prosecution of the patent.   (P-121).   And Plaintiff introduced later-discovered evidence demonstrating that Gunnerman had complete control over GRD/SulphCo's intellectual property, including the Yen Patent.  (1 Tr. 123:21-124:1 (Gunnerman controlled GRD); 1 Tr. 124:22-125:1 (controlled GRD's contracts); 1 Tr. 125:22-126:19, 148:10-13 (SRT / Yen patent developed partly at Gunnerman's residence); *see also* P-153; 1 Tr. 189:3-15 (Gunnerman paid for and controlled the process for the first SRT patent, and had the rights to the research contract and the SRT)).

In any event, Defendants' position, even if accepted, cannot mean that *all* of SulphCo's IP is off-limits.   Defendants did nothing to establish that any ELA-related Gunnerman ideas and inventions that either (a) were not revealed in the Termination and Release, or (b) originated *after* April 2003, should not belong to Talisman.   As the evidence at trial established, the intellectual property that falls within these categories is easily identified:

- Defendants did not reveal the following patents and patent applications to Capital Strategies or to CFT at any time prior to April 2003, despite the fact they were in existence at the time:  '992 Patent (P-131), '988 Application (P-127), '844 Patent (P-134);

- The following patents and applications originated *after* April 2003:  '628 Patent (P-135), '566 Patent (P-302), '600 Application (P-137), '405 Application (P-307), '440 Patent (P-311), '500 Application (P-315), '068 Application (P-320), '915 Application (P-322).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                         - 19 -

Without Capital Strategies' or Talisman's authorization, Gunnerman assigned all of these patents and applications to SulphCo. (*See* P-131 at 2; P-134 at 2; P-135 at 2; P-297 at 4; P-137 at 1; P-307 at 1; P-311 at 2, P-315 at 1; P-320 at 1; P-322 at 1).[16]

## V.   Defendants' Shareholder Reliance / Laches / Waiver and Equitable Estoppel Defense

SulphCo argued that from the April 2003 TTAA until June 2005 no claim was asserted against SulphCo or Gunnerman and, as a result, SulphCo continued to raise money from the investing public. Tiptoeing quietly past the obvious question whether SulphCo raised such monies without disclosing all the material risks to its technology and its business, SulphCo claimed that this fact gives rise to the defenses of "estoppel, waiver, and laches."[17] (7 Tr. 1626:9-12). In fact, SulphCo's / Gunnerman's attorney Heines knew about a potential claim as early as 2004. (P-215 at 2 (Heines advising defendants that TTAA does not foreclose "a claim against any of Rudy's other patent rights, *i.e.* the ones that were assigned (or licensed) to SulphCo and possibly others that were not licensed to either SulphCo or CFT").

SulphCo's Chief Financial Officer, Stanley Farmer, testified in an attempt to establish that the company's shareholders had purchased stock worth millions of dollars, some portion of which was used for research and development costs, purportedly hoping for an attractive investment

---

[16] Given the history of defendants' failure to produce documents in the discovery phase of this case (*see* P-346 at 3), by no means can the Court exclude the possibility that other such patents and applications likely exist that have not yet been revealed by defendants.

[17] Defendants turn estoppel on its head by suggesting Talisman is estopped from making its claims because CFT – whose actions were based on the Gunnermans' pervasive and purposeful misrepresentations – led Rudolf Gunnerman to believe that the Sulfur Removal Technology belonged to him. But this Court cannot ignore the significant evidence of the Gunnermans' fraudulent concealment of material facts regarding the SRT, in other words, the Gunnermans' "unclean hands." *See* 30A C.J.S. Equity §102; *id.* §95 (one seeking equity "must do equity"). Likewise, waiver is an equitable defense. *See e.g. Westgate v. Westgate*, 110 Nev. 1377, 1380, 887 P.2d 737, 739 (1994). The doctrine of unclean hands "bars a party from receiving equitable relief because of that party's own inequitable conduct." *Las Vegas Fetish & Fantasy Halloween Ball, Inc. v. Ahern Rentals, Inc.*, 182 P.3d 764, 766 (Nev. 2008). Gunnerman's own misconduct must bar application of his affirmative defenses. *E.g. Donell v. Perpetual Inv., Inc.*, 2007 WL 1723473, *8 (D. Nev. 2007).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

return.  This investment, SulphCo posited, should preclude Talisman from making its claim, even if Gunnerman were found to have blatantly breached the TTAA by wrongfully assigning Talisman property to SulphCo.  Under cross-examination, however, it became clear that SulphCo's Farmer was completely unable to support his contention from the company's financial statements and SEC filings, rendering his testimony wholly unpersuasive.  (10 Tr. 2625:13-2626:13, 2628:13-23).  Among other things, Farmer confessed that he was unable to rely on the work of the five audit firms that had proceeded through the revolving door of SulphCo's books in the company's short corporate lifetime (and which had issued multiple restatements of the company's finances in the process).  (10 Tr. 2592:1-8, 2624:18-23; 9 Tr. 2328:25-2329:23).  Farmer also admitted that he could not rely on *any* of the company's financial statements, from which he derived the substantive basis of his testimony, before he took the CFO position in 2007.  (10 Tr. 2628:7-23 (refusing to vouch for company's financial statements of the cash portion of investor-raised equity)).  Without Farmer's support for SuphCo's numbers, its defense falls apart.

The SulphCo SEC filings themselves called into question the equitable premise underlying SulphCo's defense, as the company's financial statements established that the equity numbers included substantial hedged short-sale positions, the holders of which had no interest whatsoever in the company's performance.  (10 Tr. 2604:13-2605:17).  Finally, the company's filings reveal a 2007 SEC inquiry into SulphCo's accounting for research and development expenses – the same expenses Defendants consider central to their estoppel defense.  (10 Tr. 2612:4-2613:1).

## VI.   Defendants' "Made-Up Claim" "Defense"

Finding both the law and the facts decidedly against them, Defendants resorted at last to the famously predictable "pound the table" strategy.  Their counsel went to great pains to deflect attention from Gunnerman's parade of lies by arguing, without any credible evidence, that

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                   - 21 -

Talisman had brought a "bad faith claim."  (*See* 1 Tr. 72:19).  In the effort Defendants' counsel branded as co-conspirators Dan Klaich and other Klaich family members who had lost millions of dollars relying on Gunnerman (3 Tr. 541:16-542:15), CFT's Patrick Grimes and Alex Paior, Talisman's Tirman, and even Talisman's trial counsel.  (1 Tr. 88:4-89:3).  As the Court will recall, impugning Dan Klaich's character was not something he took lightly; he sternly rejected the notion that he conspired to encourage Talisman to bring a "made-up claim," as SuphCo's counsel alleged.  (1 Tr. 49:18, 3 Tr. 714:22-715:5).  Instead, Klaich and others merely told the truth, for example, about their late 2004 discovery that the CFT board had not approved the SRT separation and the 2005 discovery of Peter and Rudolf Gunnerman's incriminating correspondence with Yen.  Klaich also testified truthfully regarding why he did not press the issue of similarity of the technologies in 2003, citing the agreement he reached with Kirk Schumacher.  (3 Tr. 589:11-23).

On the other hand, the Gunnermans and their counsel were unable to support their wild charges that Talisman is guilty of bringing a bad-faith claim – a "good old fashioned shakedown," according to SulphCo's former president, Peter Gunnerman.  (4 Tr. 815:22-86:10).  The Gunnermans claimed that, just before filing this suit, Talisman's Tirman threatened them with short-selling of SulphCo stock, bad publicity and lawsuits if they did not give in to his demands.  When confronted with the allegations contained in the Gunnermans' own (Delaware) lawsuit against Talisman, CFT, Tirman and Grimes, however, the Gunnermans could not explain the obvious contradiction.  (P-344 ¶40 ("no mention of" the lawsuits "when [Tirman] met with the Gunnermans"); 4 Tr. 897:16-24; 8 Tr. 1864:11-1866:3).  That evidence exposed Defendants' histrionic behavior for what it is – a red herring, to put it mildly.

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

**LAW AND ARGUMENT**

I.     **Judgment Should Be Entered in Talisman's Favor on Its Breach of Contract Claims (Counts One and Two)**

     A.     **Talisman Has Proven that Gunnerman Is Liable for Breach of the TTAA[18]**

          1.     **The TTAA, As Amended, Is Valid and Effective**

Defendants admitted the "TTAA, as amended, is valid and effective."  (*See* Pretrial Order (Doc. #168) at 3).  *See Patterson v. Hughes Aircraft*, 11 F.3d 948, 950 (9th Cir. 1993) (parties are bound by contents of pretrial order).[19]

          2.     **Gunnerman Breached the TTAA**

This Court has determined that "the meaning of the term 'Field' is ambiguous," recognizing that "[t]he amount of conflicting testimony from experts and lay persons who have attempted to define the scope of 'Field' indicates the sheer difficulty of interpreting this term." (Doc. #156 at 10).[20]  As the Court is aware, the goal of contract interpretation is to ascertain the shared intention of the parties.  *Caldera Properties-Lewes/Rehoboth VII, LLC v. Ridings Dev., LLC*, 2008 WL 3323926, at *12 (Del. Super. 2008).

---

[18] The TTAA contains a Delaware choice-of-law clause.  (*See* P-18, §6.6).  The elements of breach of contract under Delaware law are (1) a valid contract;  (2) breach of an obligation imposed by that contract; and (3) resulting damage to the plaintiff.  *VLIW Tech. LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[19] In addition, the TTAA was validly transferred to Talisman.  The TTAA permitted assignments (P-24 at p. 3), and Capital Strategies assigned all of its rights under the TTAA, including all intellectual property and litigious rights, to Talisman.  (*See* 8 Tr. 1846:17-1847:13; *see also* 8 Tr. 2012:8-2013:7 (valuable consideration was paid by Talisman).  Although Defendants attempted to challenge the consideration Talisman paid to Capital Strategies, they have no standing to question the sufficiency of consideration.  *See Coalition of Clergy v. Bush*, 310 F.3d 1153, 1163 (9th Cir. 2002) ("well-established rule that a litigant may assert only his own legal rights and interests and cannot rest a claim to relief on the rights of third parties."); *Harper v. Delaware Valley Broad., Inc.*, 743 F. Supp. 1076, 1089 (D. Del. 1990) ("serious doubt as to whether [someone] can challenge the sufficiency of consideration in a contract to which he is not a party").

[20] Talisman respectfully maintains its objection to the finding of ambiguity and the admission and consideration of extrinsic evidence and submits that the only issue in dispute concerns a disagreement over how the term applies to these facts, but acknowledges that the Court has made definitive rulings on the record on this point.  (*See* Doc. #156 (Order on Motion for Summary Judgment) and Doc # 192 (Order on Plaintiff's Motion in Limine to Exclude Extrinsic Evidence)).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                    - 23 -

In interpreting the term "Field," the Court should first approach the TTAA as an *objective* third party, without regard to the parties' subjective beliefs.  *See West Willow-Bay Court*,  2007 WL 3317551, at \*9 (citing *Progressive Int'l Corp. v. E.I. du Pont de Nemours & Co.*, 2002 WL 1558382, at \*7 (Del. Ch. July 9, 2002)); *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at \*1 (Del. Ch. Nov. 8, 2007); *accord Contractors Equip. Maintenance Co., Inc. ex rel. U.S. v. Bechtel Hanford, Inc.*, 514 F.3d 899, 903 (9th Cir. 2008), *Buckley v. Terhune*, 441 F.3d 688, 695 (9th Cir. 2006), *Koepping v. Tri-County Metro. Transp. Dist. of Oregon*, 120 F.3d 998, 1002 (9th Cir. 1997).  In other words, "intent does not invite a tour through [a party's] cranium with [the party] as the guide." *Progressive Int'l Corp.*, 2002 WL 1558382, \*7; *Anderson v. Del. Dept. of Admin. Servs.*, 1992 WL 183080, at \*3 (Del. 1992) ("Judicial construction of a contract requires a determination of the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties." (internal citation omitted)).  This objective theory of contracts applies even when, as here, the Court has found an ambiguity.  *See United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) ("[T]he introduction of extrinsic, parol evidence does not alter or deviate from Delaware's adherence to the objective theory of contracts.").

The Court should look to the most objective indicia of the parties' intent first:  the words found in the written instrument.  *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. Jan. 17, 2008); *Matulich v. Aegis Comms. Group, Inc.*, 2007 WL 1662667, at \*4 (Del. Ch. May 31, 2007).  The parties to the TTAA chose to express their intention about the scientific scope of the intellectual rights being transferred by incorporating the term "Field" from the ELA. The evidence offered at trial confirmed that both Gunnerman and Capital Strategies intended that Gunnerman would convey, and Capital Strategies would own, all intellectual property in or related

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

to the "Field."  (1 Tr. 103:17-24; 2 Tr. 352:5-8; 4 Tr. 981:16-982:3; 4 Tr. 986:7-24; 4 Tr. 988:15-989:6; 5 Tr. 998:21-1000:16; 5 Tr. 1158:4-22).  There was no evidence that the parties expressed any intention that the SRT was not within the definition of Field for purposes of the TTAA, much less was there evidence that there was any such shared intention.  To the contrary, both parties agreed that everything in the Field would be transferred.

Defendants' suggested interpretation of "Field" ignores the explicit language the parties negotiated and agreed to, as well as Gunnerman's own testimony that he intended to convey everything in the "Field."   At trial, Defendants' counsel repeatedly referred the Court to Judge Pro's decision in *Red Rock Comms., Inc. v. American Telecasting, Inc.*, 2006 WL 2524195, at *6 (D. Nev. 2006), as support for their interpretation of "Field," that is, that Gunnerman and Capital Strategies both intended and agreed that the term "Field" does not include the SRT, even though the language they agreed to in the TTAA does not reflect any such agreement.  As a preliminary matter, the court in *Red Rock* was applying Arizona law – not Delaware or even Nevada law. Further, the language Defendants rely on from *Red Rock* is based upon a mere extrapolation of illustrations to comments to the Restatement (Second) of Contracts.  In any event, even *Red Rock* acknowledges that the parties' agreement to an alternate meaning of an otherwise clear term must be proven with credible evidence.  There is a total absence of such evidence here.  The record fails to show any objective manifestation of mutual intent to define "Field" in a way other than what the TTAA itself provides.  To the contrary, the record reveals that there was no special meaning agreed upon.  The only intent manifested by both Gunnerman and Capital Strategies was that the TTAA convey all intellectual property in or related to the Field, as that term is defined in the ELA. (1 Tr. 103:17-24; 2 Tr. 352:5-8; 4 Tr. 981:16-982:3; 4 Tr. 986:7-24; 4 Tr. 988:15-989:6; 5 Tr. 998:21-1000:16; 5 Tr. 1158:4-22).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                               - 25 -

Had the parties wanted a restricted definition of Field to be used in the TTAA, they knew how to express that intent. They excluded SulphCo technology from the scope of the Field for purposes of the noncompetition agreement in the Termination and Release. If it had been consistent with their shared intention for the TTAA, they could have simply borrowed that language from the Termination and Release to restrict the scope of the assets Capital Strategies was acquiring. *See, e.g.*, *Seaford Golf & Country Club v. E.I. du Pont de Nemours & Co.*, 925 A.2d 1255, 1263 (Del. 2007) (noting that if a party had intended the meaning of a term that it asserted during litigation, it "knew how to express that intent," particularly considering it had used terms that would have accomplished its asserted intent in other agreements).

Defendants' counsel complained at trial that it would be unreasonable to read the TTAA as giving up SulphCo's technology when the Termination and Release allowed him to work at SulphCo. But Defendants knowingly assumed the risk of this outcome when they agreed to the TTAA in April 2003 and again in December 2004, even though, according to their own patent counsel, it "was not sufficiently tight to prevent a claim against" the SulphCo technology. (P-215). Now they ask the Court to hold them harmless from the very risk that they elected to take. The Court cannot rewrite the contract to produce a result different than what the parties bargained for. *See Conner v. Phoenix Steel Corp.*, 249 A.2d 866, 868 (Del. 1969) ("[A] court may not, in the guise of construing a contract, in effect rewrite it to supply an omission in its provisions."); *Picciotti v. Piccioti*, 1992 WL 510194 (Del. Fam. Ct. Dec. 7, 1992) (that the result of an agreement would be "unfortunate" does not change the prohibition that the "court cannot rewrite the agreement for the parties"); *see also* 5 *Corbin on Contracts* §24.22 ("Parties are entitled, under freedom of contract, to make contracts that seem to others, or even to themselves, to be unreasonable. The courts' preference for a reasonable interpretation is appropriately exercised

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                          - 26 -

1   only when two or more interpretations are possible and it is unclear which of these the parties

2   intended.").

3             **3.**       **Talisman Has Suffered Harm as a Result of Gunnerman's Breach**

4          Finally, Talisman has been damaged from Gunnerman's breach, in that Talisman has been

5   wrongfully denied the ownership right to which it is entitled in important technology that was

6   transferred to Talisman under the TTAA.  (*See* 8 Tr. 1851:16-1852:6, 1928:13-1930:17, 2005:20-

7   2006:3).  Talisman has been further harmed by the loss of opportunity to develop, capitalize, and

8   market the SRT, and by Gunnerman's exploitation of the SRT at SulphCo.  (8 Tr. 1851:16-1852:6,

9   1928:13-1930:17, 2005:20-2006:3).

10

11          The "damage" element of a breach of contract claim is satisfied by showing that "the

12   breach of contract has put the complainant in a worse position than complainant would have

13   occupied had there been no breach."  11 *Corbin on Contracts* §55.12.  Contrary to Defendants'

14   suggestion at trial, Talisman is not required to prove monetary damages as an element of a breach

15   of contract claim.  Rather, Talisman must show only "damage," which means the "factual harm

16   suffered" as a result of the breach.  *Id*.  "[A] breach of contract always creates a right of action,"

17   even if there is no proof of monetary damages.  *Cut Rate Drug Co. v. Scott & Gilbert Co.*, 54 Nev.

18   407, 20 P.2d 651, 653 (1933).  Proof of damages, as distinct from proof of harm, goes only to the

19   recovery of monetary compensation available as a remedy for breach.  *See Black's Law Dictionary*

20   at 416 (8th ed. 2004) ("damage" is the "[l]oss or injury to a person or property"; "damages" is

21   "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury").

22

23

24

25

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}

**B.** **Talisman Is Entitled to Declaratory Judgment, Specific Performance and Damages**

To remedy Gunnerman's breach, the Court should (1) enter a declaratory judgment as set forth below; (2) order specific performance of the TTAA; and (3) award Talisman its attorneys fees as damages, all as discussed in more detail below.

**1.** **Declaratory Judgment**

Count One of the Complaint asks this Court to afford Talisman the non-exclusive, discretionary remedy of declaratory relief afforded by 28 U.S.C. § 2201.  Declaratory relief is warranted here because "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue" and "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  *McGraw-Edison Co. v. Preformed Line Prods. Co.*, 362 F.2d 339, 342 (9th Cir. 1966) (internal quotations omitted).[21]  Talisman prays that this Court enter judgment declaring that (i) all of Rudolf Gunnerman's past, present and future right, title and interest in the intellectual property in or related to the Field, including without limitation U.S. patent application nos. 60/781,043, U.S. published patent application nos. 2008/0067055, 2006/0260405, 2006/0101919, 2006/0180500, 2006/0238068, 2006/0196915, 2004/0227414, 2004/0079680, 2003/0051988, 2003/0014911, 2005/0274600 and 2005/0205463, and U.S. Patent nos. 6,402,939, 6,500,219, 6,652,992, 6,827,844, 6,897,628, 7,300,566 and 7,275,440, as well as any corresponding foreign patents or patent applications and associated intellectual property, was

---

[21] It is well-established that "[t]he existence of another adequate remedy at law does not preclude a judgment for declaratory relief in cases where it is appropriate." Fed. R. Civ. P. 57; *see* 28 U.S.C. § 2201 (the court "may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought*" (emphasis added)).  Said differently, where declaratory relief would be effective, "the fact that another remedy would be equally effective affords no ground for declining declaratory relief." FED. R. CIV. P. 57 advisory comm. notes (1937).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

transferred to Talisman under the TTAA; and (ii) the assignments of the foregoing patents and patent applications to SulphCo are null and void.

### 2.    Specific Performance of the TTAA[22]

This Court should also order Gunnerman to specifically perform his obligations under the TTAA.[23]   The terms of the TTAA are sufficiently definite and certain as to what rights were transferred under the agreement.   *See Kern v. Kern*, 107 Nev. 988, 823 P.2d 275, 277 (1991) ("material terms such as subject matter" must be "[]sufficiently certain and definite to support specific performance.").   That this Court previously found the term "Field" to be ambiguous does not defeat specific performance.   *See Lee Builders, Inc. v. Wells*, 92 A.2d 710, 714 (Del. Ch. 1952) ("In determining whether or not a contract meets with [the certainty] requirement, a court will avail itself of the usual aids of construction, just as in the case of enforcement by other remedies.").   To the contrary, subject to this Court's determination that the definition of "Field" includes the SRT, the intellectual property rights that comprise the SRT, including the specific patents and patent applications, are readily identifiable and subject to specific performance.

At the same time, the remedy at law is inadequate.   *See, e.g.*, *Vaughan v. Creekside Homes, Inc.*, 1994 WL 586832, at *4 (Del. Ch. June 17, 1994) (specific performance is available when "the remedy at law is impracticable or fails to do justice.").[24]   The intellectual property rights that

---

[22] At trial Defendants argued that Talisman should not be granted specific performance because, they claimed, it was not sufficiently pled.   (10 Tr. 2446:12-16).   This argument is nothing more than a distraction, as not only was this relief sought initially, more importantly it is clearly set forth in the Pretrial Order (*see* Doc. #168 at 8).   *See Patterson*, 11 F.3d at 950 (9th Cir. 1993) ("pretrial order generally supersedes the pleadings, and the parties are bound by its contents").

[23] *See Carcione v. Clark*, 96 Nev. 808, 618 P.2d 346, 348 (1980) (specific performance is appropriate where (1) "the terms of the contract are definite and certain," (2) "the remedy at law is inadequate," (3) "the plaintiff has tendered performance," and (4) "the court is willing to order it." (internal citations omitted)); *see also Mayfield v. Koroghli*, 124 Nev. 34, 184 P.3d 362, 367 (2008).

[24] Generally, the legal remedy is inadequate where (1) damages would be insufficient because the subject matter of the contract is so unique or of such a special nature that it resists translation into quantitative terms, that is, the damage

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                   - 29 -

were transferred under the TTAA are unique – so unique that they are the subject of numerous patents issued by the U.S. Patent and Trademark Office.  As such, a complete assessment of monetary damages for Gunnerman's breach of the TTAA would be impractical and too speculative,[25] leaving no adequate remedy at law.  *See Amaysing Tech. Corp. v. CyberAir Comms., Inc.*, 2004 WL 1192602, at *3-4 (Del. Ch. 2004) (finding that an agreement to support the development of novel technology in exchange for an interest in that technology "involves a unique asset," the loss of which cannot be adequately compensated with money damages); *Derwell Co. v. Apic Inc.*, 278 A.2d 338, 343 (Del. Ch. 1971) (remedy inadequate if an assessment of monetary damages is impractical or too speculative; *see also Stoltz v. Grimm*, 689 P.2d 927, 930 (Nev. 1984) (where property is unique, "[a]n action at law for breach [and] damages would . . . be inadequate").  Specific performance is designed to provide a remedy in these very circumstances. *See Equitable Trust Co. v. Gallagher*, 102 A.2d 538, 546 (Del Ch. 1954) ("[T]he remedy of specific performance is designed to take care of situations where the assessment of money damages is impracticable or somehow fails to do justice.").

Turning to the third element of specific performance, there is no dispute that Capital Strategies and Talisman performed their obligations under the TTAA, including Capital Strategies' payment of substantial sums to Gunnerman.  (2 Tr. 338:11-15).  Thus, the only

---

remedy would not be a just and reasonable substitute for or representative of that subject matter in the hands of the party entitled to its benefit; or (2) damages are impracticable because it is impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty.  25 *Williston on Contracts* §67.8; 12 *Corbin on Contracts* §1142.  Where there is doubt that damages alone are sufficient remedy, "the doubt should be resolved in favor of granting [specific performance]." *Restatement (First) Contracts* §358, cmt. c.

[25] Because the SRT has not been successfully marketed commercially, and SulphCo has yet to turn a profit (1 Tr. 236:7-240:7, 7 Tr. 1589:13-1591:5, 1591:20-1593:2, 1598:6-1600:14), monetary damages for loss of the right to develop and market the SRT would be extremely difficult, if not impossible, to calculate.  *See Amaysing Techs. Corp.*, 2004 WL 1192602, at *4 (Del. Ch. 2004) ("With its technology still undeveloped, ATC's ability to prove lost profits damages would be highly doubtful.  Because such damages are likely to be merely speculative, ATC has no adequate remedy at law and is entitled to pursue its equitable remedy . . . .").  Defendants have admitted as much.  (*E.g.*, Doc. #211 at 22 ("Any damage claim is speculative")).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

question left for the Court is whether to grant specific performance in the exercise of its discretion. *See McCann v. Paul*, 90 Nev. 102, 520 P.2d 610, 611 (1974).  Should this Court determine that the SRT falls within the Field and thus was assigned to Capital Strategies and later Talisman under the TTAA, Talisman submits that the Court must order Gunnerman to comply with his obligations.

Defendants attempt to avoid specific performance by fashioning SulphCo as a third-party bystander to Gunnerman's misrepresentations, who took title to the SRT without knowledge of its title defects.  SulphCo has failed to and cannot establish, however, that it is entitled to be regarded as a bona fide purchaser of the SRT.  *See Cieniewicz v. Sliwka*, 133 A. 695, 695 (Del. Ch. 1926) ("the burden has been held to rest on the defendants to sustain the defense of bona fide purchaser for value and without notice."); *Bailey v. Butner*, 64 Nev. 1, 176 P.2d 226, 228-29 (1947) (same).  From its inception,[26] SulphCo knew that its right to the SRT was in question, first because of Gunnerman's deception to CFT, but then later because of Gunnerman's and SulphCo's knowing evasiveness with respect to the TTAA.  Thus, SulphCo, like Gunnerman, took the risk that Capital Strategies and later Talisman would discover the true nature of the SRT and pursue its rights under the TTAA.  SulphCo cannot now be heard to protest its innocence.

Perhaps recognizing its station, SulphCo invokes the name of its shareholders who, it implies, are innocent and invested millions of dollars into SulphCo.  Even assuming that they invested without knowledge of Gunnerman's deceit (Defendants certainly made no effort to prove that), it would be completely inequitable to leave Talisman "holding the bag" when Talisman has exercised its legal rights to right this wrong – and SulphCo's shareholders have their own rights

---

[26] From SulphCo's inception until 2007, Gunnerman was SulphCo's CEO, Chairman of the Board and majority shareholder (*see* 7 Tr. 1600:7-10, 1707:11-1708:17) such that his knowledge is imputed to SulphCo.  *See Carlson v. Hallinan*, 925 A.2d 506, 542 (Del. Ch. 2006); *Bates v. Cottonwood Cove Corp.*, 84 Nev. 388, 392, 441 P.2d 622, 624 (1968).  Moreover, several other SulphCo actors, including its President Kirk Schumacher, had direct participation in the negotiations of the TTAA.

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}

- 31 -

that they could assert against Gunnerman and SulphCo's management to remedy any wrong that was done to them.  SulphCo's shareholders have adequate recourse under, *inter alia*, the federal securities laws; they should not prevent Talisman from getting the relief it is due.

SulphCo also implies specific performance is impossible because Gunnerman assigned the SRT to SulphCo, in violation of the TTAA.  This argument suffers from at least two fatal flaws.  First, as to intellectual property that came into being after April 23, 2003, the TTAA created an automatic assignment of all technology within the Field, requiring no further action by Gunnerman to transfer legal title to the intellectual property rights  subject to the TTAA to Capital Strategies.[27]  The language in the TTAA, wherein Gunnerman "hereby assigns, transfers, conveys and delivers" the intellectual property rights, created an automatic assignment of all patent rights within or related to the Field.  *See DDB Tech. LLLC v. MLB Advanced Media, LP*, 517 F.3d 1284, 1290 (Fed. Cir. 2008) (language "agrees to and does hereby grant and assign" creates automatic assignment).[28]  As such, SulphCo has never held valid title to technology rights in or related to the Field, that Gunnerman purported to transfer after execution of the TTAA.   Any attempted assignments of such rights to SulphCo after April 23, 2003 are absolutely void.

Second, as to intellectual property that existed as of April 23, 2003, Gunnerman warranted that he owned the technology in or related to the Field free and clear of any "license, sublicense, or

---

[27] "[W]hether an assignment of patent rights in an agreement . . . is automatic, requiring no further act on the part of the assignee, or merely a promise to assign depends on the contractual language."  *DDB Tech. LLLC v. MLB Advanced Media, LP*, 517 F.3d 1284, 1290 (Fed. Cir. 2008). Section 2.1 of the TTAA provides that "Assignor hereby assigns, transfers, conveys and delivers to Assignee and Assignee hereby acquires from Assignor, . . ." the defined intellectual property rights.  (*See* P-18, §2.1).

[28] *See also FilmTec Corp. v. Hydranautics*, 982 F.2d 1546, 1548 (Fed. Cir. 1993) (language "does hereby grant . . . the full and entire domestic right, title and interest in" creates an automatic assignment); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000) (language that assignor "hereby conveys, transfers, and assigns" the inventions creates an automatic assignment and, as such, "transfer of title . . . occur[red] by operation of law." (quoting *Filmtec*, 939 F.2d at 1573)).  *Cf. Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580 (Fed. Cir. 1991) (agreement that provided that rights "will be assigned" was an agreement to assign, not an assignment, and conveyed only equitable rights to the assignee).

ROBISON, BELAUSTEGUI, SHARP & LOW
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                    - 32 -

1    other agreement" and that he had not "granted any person or entity any rights, license, sublicense

2    or other agreement or otherwise, to use the Intellectual Property Rights, other than pursuant to the

3    Exclusive License." (*See* P-18 at § 3.3(a)).[29]  This warranty should be enforced.

4                        **3.      Attorneys Fees as Damages**

5            Talisman has been forced to prosecute this lawsuit to obtain Gunnerman's compliance with

6    his obligations under the TTAA and recover the SRT.  As such, Talisman has been damaged in the

7    amount of the attorneys' fees it has been forced to expend and should be awarded that amount as

8    damages.  *See Sandy Valley Assoc. v. Sky Ranch Estate Owners Assoc.*, 117 Nev. 948, 957, 35

9    P.3d 964, 970 (2001) (attorneys' fees expended to "recover[] real or personal property acquired

10   through the wrongful conduct" of defendants may be awarded as an element of general damages

11   under Nevada law); *Nevins v. Bryan*, 885 A.2d 233, 255 (Del. Ch. 2005) (attorney's fees

12   recoverable as damages where, "the underlying (pre-litigation) conduct of the losing party was so

13   egregious as to justify an award of attorneys' fees as an element of damages" and/or "the litigation

14   was brought in bad faith or . . . a party's bad faith conduct increased the costs of litigation.").  The

15   evidence at trial established that Talisman has incurred $1.3 million in attorneys' fees in pursuing

16   its rights under the TTAA.  (7 Tr. 1784:2-17).  Talisman should be awarded these fees as

17   damages,[30] in addition to specific performance and declaratory judgment.  *See, e.g., Vaughan,*

18

19

20

---

21   [29] Although Defendants maintain that the SRT has nothing to do with the "Field" of aqueous fuels or emulsions, they

22   assert that Capital Strategies should have known from the face of the '939 Patent that the SRT had everything to do
     with the "Field" of aqueous fuels or emulsions.  But these arguments ignore the undisputed evidence.  Capital

23   Strategies did not have the opportunity to perform due diligence on the science of CFT's and SulphCo's technology
     and otherwise lacked background in those fields.  Perhaps even more importantly, Capital Strategies had no basis to

24   know Gunnerman had any interest in the '939 Patent.  That patent was issued in the name of Professor Yen and
     others; Gunnerman's name does not appear on the patent except as prior art.  It was only through the investigation

25   leading to the filing of this suit that Gunnerman's interest in the '939 Patent became apparent.  (7 Tr. 1727:7-1738:5).

     [30] Talisman specifically requested attorney's fees in its Complaint.  (*E.g.*, Doc. #2, ¶¶ 42, 50).  Thus, despite their
     claims of surprise at trial, Defendants have been on notice of Talisman's claim to attorney's fees.  *See* Doc. #212 at p.
     8 (Defendants recognizing that that Talisman has asked for attorney's fees); *cf.* 5A Charles Alan Wright, *Federal*

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                              - 33 -

1    1994 WL 586832, at *4 (damages may be awarded in addition to specific performance "if a decree

2    of specific performance does not give complete and full relief").[31]

3    **II.    Judgment Should Be Entered in Talisman's Favor on Its Implied Duty of Good Faith**
         **and Fair Dealing Claim (Count Four)**

4

5         In every contract, there is an implied covenant of good faith between the parties.  *Dunlap*

6    *v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).  The duty of good faith "is the

7    obligation to preserve the spirit of the bargain rather than the letter, the adherence to substance

8    rather than form."  *Pierce v. Int'l Ins. Co. of Ill.*, 671 A.2d 1361, 1366 (Del. 1996).  "Subterfuges

9    and evasions violate the obligation of good faith in performance even though the actor believes his

10   conduct to be justified."  *R. M. Williams Co. v. Frabizzio*, 1993 WL 54423, at *9 (Del. Super. Feb.

11   8, 1993) (quoting *Restatement (Second) of Contracts* § 205 cmt. d).

12

13   _____

14   *Practice and Procedure* § 1310 ("the purpose of requiring that special damages be specifically pleaded is to protect the defendant against being surprised at trial by the extent and character of the plaintiff's claim."). Furthermore, evidence of the amount of costs and fees incurred in pursuit of the SRT was presented at trial without objection by Defendants.  (7 Tr. 1784:2-17).  As a result, this issue was tried by the parties' consent and "must be treated in all respects as if raised in the pleadings."  Fed. R. Civ. P. 15(b)(2).  *Accord* Fed. R. Civ. P. 54(c) (a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings"); (awarding attorneys' fees as damages even though not specifically pled as special damages); *Sandy Valley*, 35 P.3d at 971 ("Although attorney fees as damages were not pleaded in the complaint, evidence regarding attorney fees as damages was introduced and litigated at trial. . . . [T]he failure to plead special damages . . . did not deprive the district court of its power to award attorney fees as damages because the matter had been tried, without objection.") (citing *Summa Corp. v. Greenspun*, 96 Nev. 247, 607 P.2d 569, 574 (1980)).  The Defendants' suggestion that attorneys fees should not be awarded because they were not included among Talisman's Initial Disclosures ignores the inherent fairness principles implicit in the Federal Rules.  Rule 15(b)(2) acknowledges that where, as here, an issue is tried by consent, it is immaterial whether it appears in the pleadings.  Further, Rule 37(c) provides that exclusion of testimony for failure to disclose is required, "unless the failure was substantially justified or is harmless."  The purpose of the "harmless" language is to "avoid unduly harsh penalties in a variety of situations," including failure to disclose "a potential witness known to all parties."  Fed. R. Civ. P. 37(c) cmt. (c) (1993).  Here, the failure to include attorneys fees among the initial disclosures was entirely harmless, and the Court allowed Mr. Tirman to testify on the issue.

15

16

17

18

19

20

21

22

23   [31] In turn, the availability of damages – particularly the limited damages that Talisman seeks – does not act to bar the award of specific performance.  Rather, "[i]n order for a legal remedy to act as a bar to the equitable relief of specific performance, the legal remedy must be as complete, practical, and efficient to the ends of justice and its prompt administration as the equitable remedy, and also must be available to the plaintiff as a matter of right."  *Williams v. White Oak Builders, Inc.*, 2006 WL 1668348, at *4 (Del. Ch. Feb. 6, 2006).  Obviously, an award of attorneys' fees as damages would not completely remedy Gunnerman's breach of contract.  Hence, specific performance remains available and appropriate.

24

25

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                              - 34 -

The overwhelming evidence of Gunnerman's breach of this duty includes:

- misrepresenting the discovery and nature of the SRT to the board of CFT, in contravention of his fiduciary obligations to CFT (*see* 1 Tr. 131:21-132:11, 149:24-151:20; 3 Tr. 724:10-724:21, 2 Tr. 429:15-429:25, 430:13-430:21, 434:7-434:14; 4 Tr. 759:2-760:3, 760:24-762:13; 6 Tr. 1417:14-1419:2; 7 Tr. 1539:11-1539:17; 5 Tr. 1191:19-1194:16);

- using Townsend, Townsend & Crew as his patent counsel and to negotiate the TTAA and related agreements on his and SulphCo's behalf, despite the existence of a conflict of interest with CFT, in contravention of his fiduciary obligations to CFT (*see* 1 Tr. 190:15-191:14, 231:15-231:19; 2 Tr. 442:10-446:19, 3 Tr. 487:15-490:7, 497:22-498:16 P-171 (Klaich seeking legal advice from Heines in connection with Gunnerman's 2000 consulting agreement); P-173 (Heines responds to Klaich: "The problem however is that this presents a conflict of interest for us, since we represent Rudy himself, even though our representation is on other matters."); D-61 (Klaich explains: "Townsend was patent counsel to CFT for years. They drafted many of our patents. We have given them no waiver to perform this work. There are implications of this which I need not discuss at this point."); 4 Tr. 900:9-901:20; P-196 (Townsend firm representing Gunnerman and SulphCo's position in negotiations); 4 Tr. 7730-774:6.

- misrepresenting the nature of the SRT and Gunnerman's presentation of the SRT to CFT during negotiation of the Termination and Release (*see* P-196 (letter from J. Ackerman to M. Zalk); 2 Tr. 351:14-352:8;

- falsely warranting that he owned all Technology within the Field, free of any encumbrances other than the ELA (*see* P- 18 §3.3(a));

- entering into the TTAA with no intention of transferring the SRT as required by the terms of the TTAA (*see* 2 Tr. 353:14-354:3); and

- assigning the SRT to GRD (later SulphCo) for his personal benefit, *see* 1 Tr. 122:13-125:1; 4 Tr. 760:24-762:13 and in violation of the rights of CFT (later Capital Strategies and Talisman) under the TTAA.

To remedy Gunnerman's breach of the implied duty of good faith, Talisman is entitled to the relief outlined in Part I.B, *supra*. *See, e.g.*, *Tomei v. Sharp*, 902 A.2d 757, 769 (Del. Super. 2006) ("A claim for a breach of this covenant is one sounding in contract."); *Blue Chip Capital Fund II P'ship v. Tubergen*, 906 A.2d 827, 834 (Del. Ch. 2006) (remedies for breach of contract and breach of covenant of good faith are identical).

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}

- 35 -

III.    **Judgment Should Be Entered in Talisman's Favor on Its Tortious Interference with Contractual Relations Claim Against SulphCo (Count Five)**

A.      **Talisman Has Proven Each of the Elements of Tortious Interference**

Talisman has proven its claim for intentional interference with contractual relations against SulphCo, as the evidence establishes that: (1) the TTAA is a valid and existing contract; (2) SulphCo had knowledge of the TTAA; (3) SulphCo acted in a way intended or designed to disrupt the contractual relationship; (4) SulphCo actually disrupted the contract; and (5) there has been resulting damage.  *See J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 273, 71 P.3d 1264, 1267 (2003).

As discussed above, SulphCo has admitted that the TTAA, as amended, is a valid and existing contract.  Likewise, SulphCo had complete knowledge of the terms of the TTAA – SulphCo's president Kirk Scumacher and its attorney Joel Ackerman were involved in the negotiations of the TTAA (1 Tr. 243:21-25; 3 Tr. 486:9-15, 501:25-502:12; 4 Tr. 900:5-901:2, 903:13-24), not to mention the fact that Gunnerman was SulphCo's CEO and Chairman at the time of the TTAA and its amendment (P-259, Response No. 1).  *See Bates*, 84 Nev. at 392, 441 P.2d at 624 (knowledge of a corporate director or officer is imputed to the corporation).

More than its knowledge of the contract, SulphCo's actions were intended to disrupt the contract and did disrupt it.  SulphCo deliberately retained control over the SRT, even while its patent attorney and the draftsman of the SRT patents and patent applications admitted candidly to his clients that "SulphCo's intellectual property is also in the field of aqueous emulsions."  (P-215).  In October 2004, eighteen months after the TTAA was first executed and months before the 2004 amendment was signed, Heines was "still not convinced that the wording [of the original TTAA and the proposed 2004 amendment to the TTAA] is sufficiently tight to prevent a claim against any of Rudy's other patent rights, i.e., the ones that were assigned (or licensed) to SulphCo" (*id.*), and thereafter (unsuccessfully) proposed to delete all reference to the term "Field"

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                   - 36 -

in the TTAA to protect his clients.  Despite these concerns, SulphCo continued to accept the SRT from Gunnerman to the exclusion of Talisman, and thereby disrupted the TTAA.  In the end, Capital Strategies and now Talisman have been harmed by SulphCo's interference.[32]  Talisman has been denied its ownership right in the SRT and has lost the opportunity to develop, capitalize, and market the SRT.

**B.      Talisman Is Entitled to Damages, Including Punitive Damages**

As with Talisman's breach of contract claims against Gunnerman, Talisman has been forced to prosecute this lawsuit to recover the SRT, which is being used by SulphCo, to the detriment of Talisman.  Talisman has been damaged in the amount of the attorneys' fees it has been forced to expend and should be awarded that amount as damages.  *See Sandy Valley*, 117 Nev. at 957, 35 P.3d at 970; *Nevins*, 885 A.2d at 255.

Further, under Nevada law, punitive damages are appropriate "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud[,] or malice" in an amount limited to three times the amount of compensatory damages, if compensatory damages are $100,000 or more, or $300,000, if the amount of compensatory damages is less than $100,000. N.R.S. § 42.005.  SulphCo, through its CEO and majority shareholder, Gunnerman, engaged in an ongoing pattern of deception and fraud in connection with the negotiation and breach of the TTAA.  As a result, punitive damages are appropriate.

Finally, Talisman requests equitable relief to prevent SulphCo from future tortious interference with the TTAA, as Gunnerman's future intellectual property rights within the Field remain subject to the TTAA.  *See e.g. Guion v. Terra Mktg of Nev., Inc.*, 90 Nev. 237, 240, 523

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

---

[32] As discussed above, the "damage" requirement is satisfied by a showing of harm.

P.2d 847, 848 (1974) ("[e]quity will ... restrain tortious acts where it is essential to preserve a business or property interests); *accord Restatement (Second) of Torts* § 774A, comment "f."

**IV.    Judgment for Talisman Should Be Entered on Its Conversion Claim (Count Six)**

**A.    SulphCo Is Liable for Conversion**

"Conversion is a distinct act of dominion wrongfully executed over another's personal property in denial of, or inconsistent with his title or rights therein . . ." *Evans v. Dean Witter Reynolds, Inc.,* 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000).  Conversion is "an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge." *Id.*

The evidence presented at trial establishes that SulphCo converted the SRT, inconsistent with Capital Strategies' (and later Talisman's) rights to the SRT.  It is undisputed that SulphCo, as a result of assignments from Gunnerman, has been exercising control over the SRT intellectual property rights, to the exclusion of Capital Strategies and Talisman.  Thus, the sole question for the Court with respect to SulphCo's liability for conversion is whether the SRT intellectual property rights were transferred to Capital Strategies and eventually Talisman under the TTAA.  Upon the Court's determination that the SRT falls within or is related to the "Field" and thus was assigned under the TTAA, SulphCo is necessarily liable for conversion.

**B.    Talisman Is Entitled to Return of the Property, In Addition to Damages and Punitive Damages**

SulphCo should be ordered to deliver the SRT to Talisman.  Where, as here, the converted property is unique and a remedy at law would be inadequate to compensate the plaintiff, specific restitution of the property converted is appropriate.  *Restatement (Second) Torts* § 871 (if property is of "peculiar value to [the plaintiff] and the remedy at law is inadequate," plaintiff is entitled "to equitable relief for [its] specific restitution.").  *See, e.g., In re Wal-Mart Wage &Hour Employment*

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                              - 38 -

*Practices Litig.*, 490 F. Supp. 2d 1091, 1120 (D. Nev. 2007) (recognizing specific restitution as a remedy for conversion of unique and irreplaceable item); *Leasing Serv. Corp. v. Hobbs Equip.*, 894 F.2d 1287, 1291 (11th Cir. 1990) (recognizing specific restitution as a remedy).

Further, because SulphCo accepted purported assignments of the SRT in conscious disregard of Talisman's rights to the SRT, punitive damages are warranted. SulphCo participated in the April 2003 negotiation of the TTAA and, through Gunnerman, had intimate knowledge of the terms of the ELA and the nature of the SRT. Where, as here, there is clear and convincing evidence that the defendant acted "with a conscious disregard of the rights . . . of others," punitive damages may be appropriate. *Evans,*, 5 P.3d at 1052 (quoting N.R.S. § 42.001(3) as to definition of "conscious disregard"); N.R.S. § 42.005(1)(a)(b).

### C. Judgment Should Be Entered in Talisman's Favor on Its Unjust Enrichment Claim Against SulphCo (Count Seven)

SulphCo is also liable to Talisman for unjust enrichment. Recovery for unjust enrichment is appropriate where, in the absence of a written contract, there is (1) "a benefit conferred on the defendant by the plaintiff"; (2) "appreciation by the defendant of such benefit"; and (3) "acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for [the defendant] to retain the benefit without payment of the value thereof." *LeasePartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 113 Nev. 747, 942 P.2d 182, 187 (1997) (internal citation omitted).

SulphCo was the beneficiary of the SRT rights that Gunnerman was obligated to deliver to Capital Strategies/Talisman under the TTAA. It appreciated and retained the benefits of that technology by, among other things, using its potential to raise millions of dollars from public investors (7 Tr. 1648:18-1649:22), much of which ultimately enriched SulphCo and its executives, including Gunnerman and his son Peter. All the while, SulphCo had knowledge that the rights

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

should have been delivered to Capital Strategies/Talisman.  It would be a grave injustice for SulphCo to retain the benefits of the SRT in these circumstances.

This Court should use its significant latitude to construct an appropriate remedy for SulphCo's unjust enrichment.  *See, e.g.*, *Magill v. Lewis*, 74 Nev. 381, 385, 333 P.2d 717, 719 (1959) ("Various means and remedies have been employed to afford relief outside of the domains of technical contracts and torts.  Unjust enrichment, restitution, quasi contract, implied contract, resulting and constructive trusts, accounting, etc. are some of the means thus employed.").  At a minimum, the Court should order specific restitution of the SRT, requiring that the SRT assets be delivered to Talisman.  *See Restatement (Second) Torts* § 871.

**V.      Talisman Is Entitled to An Award of Its Attorneys Fees and Costs**

Finally, the judgment should award Talisman its attorneys fees and costs as a cost of litigation as authorized by the TTAA and applicable law.  (P-18, §5.2).  Talisman will submit a post-trial motion for attorneys' fees and costs as directed by the Court.

**CONCLUSION**

Talisman prays that the Court enter judgment in its favor on all counts, as set forth herein.

Respectfully submitted this 20th day of February, 2009.


            */s/ Kent R. Robison*
            KENT R. ROBISON (Nevada Bar No. 1167)
            Robison, Belaustegui, Sharp & Low
            A Professional Corporation
            71 Washington Street
            Reno, Nevada 89503
            Telephone:  (775) 329-3151

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                    - 40 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

– and –

ANDREW R. LEE, *pro hac vice*
AIMEE M. QUIRK, *pro hac vice*
EMILY E. EAGAN, *pro hac vice*
Jones, Walker, Waechter, Poitevent,
    Carrère & Denègre, L.L.P.
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone:  (504) 582-8000

Attorneys for Plaintiff

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                          - 41 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this date I caused to be electronically filed and served a true

copy of the attached document upon the following registered filing users pursuant to CM/ECF

System as set forth in Special Order No. 109 and Local Rule 5-4 of this Court:

Jack Angaran
Benjamin G. Chew
T. Michael Guiffre
Paul J. Georgeson
Ryan L. Bellows
Gerald A. Novack
Jeffrey M. Tillotson
John D. Volney

DATED:        February 20, 2009

*/s/ V. Jayne Ferretto*

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503

{N1940177.4}                                - 42 -