**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| TALISMAN CAPITAL TALON FUND, LTD., | 3:05-cv-354-BES-RAM |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| RUDOLF W. GUNNERMAN and SULPHCO, INC., | |
| Defendants. | |

This action arises out of a dispute over the ownership and transfer of certain intellectual property rights that deal with the removal of sulfur from crude oils (hereinafter referred to as the "SulphCo IP"). Plaintiff Talisman Capital Talon Fund, Ltd. ("Talisman") alleges that its predecessor-in-interest, Capital Strategies Fund, Ltd. ("Capital Strategies"), acquired the SulphCo IP rights from Defendant Rudolf W. Gunnerman ("Gunnerman") pursuant to a Technology Transfer and Assignment Agreement ("Transfer Agreement") executed on April 23, 2003 and subsequently amended. Talisman alleges that Gunnerman has breached the Transfer Agreement by continuing to exercise ownership, custody and control over the Sulphco IP rights that Talisman believes were transferred to Capital Strategies. Talisman also alleges that the SulphCo IP rights are being wrongfully used by Defendant SulphCo, Inc. ("SulphCo"), a company previously known as GRD, Inc.

Plaintiff filed this action on June 9, 2005 seeking declaratory relief as to the ownership of the Sulphco IP, as well as damages for breach of contract, bad faith breach of contract, breach of the implied duty of good faith fair dealing, tortious interference with contract, conversion, and unjust enrichment/constructive trust. Plaintiff's claims of bad faith breach of

contract and unjust enrichment against Gunnerman were dismissed on summary judgment in an Order (#156) dated September 28, 2007. A non-jury trial on Plaintiff's remaining claims commenced before the Court on December 1, 2008 and closing arguments were presented on March 3, 2009. The parties submitted separate Proposed Findings of Fact and Conclusions of Law and Post Trial Briefs. Having considered the testimony and evidence presented at trial, the briefs of counsel, and for the reasons set forth below, the Court now enters the following Findings of Fact and Conclusions of Law in accordance with its obligations under the Federal Rules of Civil Procedure. See Fed. R. Civ. Proc. 52(a) (requiring separate entry of findings of fact and conclusions of law following a bench trial).[1]

## I. FINDINGS OF FACT

1.  Talisman is a corporation incorporated in the British Virgin Islands with its registered office in Tortola, British Virgin Islands.

2.  SulphCo is a Nevada corporation with its principal place of business in Houston, Texas. SulphCo was previously known as GRD, Inc. ("GRD"), a closely-held Nevada corporation formed by Gunnerman in 1999 to pursue technologies related to the removal of sulfur from crude oil and petroleum distillates.

3.  Gunnerman is a resident of the State of Nevada and was the CEO, Chairman of the Board, and majority shareholder of GRD/SulphCo at all relevant times.

4.  Between 1997 and 2003, Gunnerman served as Chairman of the Board of Directors, Chief Executive Officer and Chief Scientist at Clean Fuels Technology ("CFT"), a company founded by Gunnerman to develop cleaner burning fuels. On January 3, 1994, CFT's predecessor-in-interest and Gunnerman entered into an Exclusive License Agreement ("ELA"), whereby CFT became the exclusive licensee of certain patents and patent applications invented by Gunnerman.

///

---

[1] Although the Court has attempted to avoid commingling findings of fact with conclusions of law, any conclusions that are inadvertently labeled as findings (or vice versa) shall be considered "in [their] true light, regardless of the label that the . . . court may have placed on [them]." Tri-Tron International v. Velto, 525 F.2d 432, 435-36 (9th Cir. 1975).

5. Section 1.1 of the ELA, as amended, defines the "Field" of technology licensed to CFT as follows:

> (a) methods, processes, compositions and apparatuses for carrying out combustion for the generation of heat in (i) internal combustion engines, either compression or spark ignited and (ii) open flame applications such as boilers and combustion turbines;
>
> (b) aqueous fuels, including fuels described in the Patents, as well as (i) methods, processes, apparatuses and compositions for their production and (ii) methods, processes, compositions and apparatuses for their combustion; and
>
> (c) methods, processes, compositions and apparatuses used for production of chemicals, petrochemicals, plastics or pharmaceuticals utilized in connection with any of the above.

6. In December of 1998, Gunnerman, his son Peter (an executive at CFT), and Alex Paior (Vice President of CFT) became aware of and started investigating sulfur removal technology being researched by an engineering professor by the name of T. G. Yen, Ph.D ("Yen"). Gunnerman informed the CFT Board of Directors that Yen's technology was distinct from the technology being developed by CFT, and that he wished to independently pursue its development at the newly-formed GRD.[2]

7. On November 28, 2000, Gunnerman and CFT entered into a Separate Corporate Opportunity Agreement, whereby CFT recognized that Gunnerman was free to develop Yen's sulfur removal technology at SulphCo. Specifically, CFT acknowledged that "[a] primary asset of SulphCo is a technology for the reduction of sulfur in petroleum products" and that "the development of SulphCo's technology was separate and apart from CFT." The preponderance of the evidence suggests that when the Separate Corporate Opportunity Agreement was negotiated and entered into, nobody at CFT viewed Yen's sulfur removal technology (hereinafter referred to as the SulphCo IP) as being within the Field of the ELA.

8. The Separate Corporate Opportunity Agreement also required Gunnerman to concede

---

[2] GRD was founded by Gunnerman in the year 1999 and conducted business under the name SulphCo. It was later merged into a public company that changed its name to SulphCo, Inc. Thus, the name "SulphCo" is hereinafter used to refer to either the closely-held corporation GRD, using the name SulphCo, or to the public company named SulphCo, Inc.

3

      to certain terms regarding his CFT voting rights and corporate governance. Additionally, Gunnerman agreed to step down as the CEO of CFT and become a consultant. The terms of Gunnerman's engagement as a consultant were set forth in a Consulting Agreement dated December 4, 2000. The Consulting Agreement prevented Gunnerman from competing with CFT in any business "within the Field," as defined in the ELA.

9. In April of 2002, one of the first patents related to the SulphCo IP was issued to Yen and assigned to SulphCo as U.S. Patent No. 6,402,939 (the "Yen Patent"). Thereafter, additional patents related to the SulphCo IP were issued to Gunnerman and assigned to SulphCo.

10. In early 2003, Capital Strategies agreed to make a substantial investment in CFT, which resulted in three agreements dated April 23, 2003 that significantly affected the relationship between Gunnerman and CFT:

    a. A Note Purchase Agreement, whereby Capital Strategies acquired Gunnerman's $20 million in outstanding loans to CFT for a purchase price of $2.2 million;

    b. A Technology Transfer and Assignment Agreement ("Transfer Agreement"), whereby Gunnerman transferred and assigned to Capital Strategies all of his "present and future right, title, and interest in and to" certain intellectual property rights related to the Field.

    c. A Termination and Release Agreement, whereby Gunnerman and CFT agreed to terminate the Consulting Agreement and modify Gunnerman's non-competition obligations. In particular, a provision in the Termination and Release Agreement clarifies that the surviving non-competition provisions of the Consulting Agreement "shall not include the 'SulphCo Field'."

11. The term "Field" in the Transfer Agreement has the same meaning as the term contained in the ELA. None of the SulphCo IP is listed in Exhibit 2.1(i) of the Transfer Agreement, which contains a non-exclusive listing of patents and applications transferred by the Agreement. The Transfer Agreement was subsequently amended

to clarify that only technology related to the Field was being transferred. The amendments also specified that "all Know-How that relates to aqueous or fuel/oil based emulsions" was being conveyed pursuant to the Transfer Agreement.

12. None of the SulphCo IP was conveyed to Capital Strategies pursuant to the Transfer Agreement or its subsequent amendments. Furthermore, the weight of the evidence indicates that Gunnerman and Capital Strategies did not intend or believe that the Transfer Agreement, as amended, conveyed the SulphCo IP to Capital Strategies. This finding is supported by the conduct of the parties during and after execution of the Transfer Agreement.

13. All of Capital Strategies' rights under the Transfer Agreement were assigned to Talisman pursuant to a Technology Transfer Assignment Agreement dated May 26, 2005. These rights did not include the SulphCo IP.

## II. CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1338(a), and venue is proper under 28 U.S.C. § 1400(b).

2. The burden of proof is upon Plaintiff to establish the elements of its claims. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1107 (9th Cir. 2000); see also Pacific Portland Cement Co. v. Food Mach. & Chem. Corp., 178 F.2d 541, 546 (9th Cir. 1949) ("In a declaratory judgment action, the party that has the burden of proof is determined . . . by the nature of the relief sought.").

3. A plaintiff in a civil action has the burden of proving its case by a preponderance of evidence. See, e.g., Parke v. Raley, 506 U.S. 20, 31 (1992); McKenzie v. McCormick, 27 F.3d 1415, 1419 (9th Cir. 1994).

4. Weighing all of the evidence and assessing the credibility of the witnesses, the Court concludes that the burden of proof has not been carried with regard to the claims asserted in this case.

5. The Transfer Agreement, as amended, and all other relevant agreements are legal and binding.

6. Gunnerman did not transfer or assign the SulphCo IP to Capital Strategies pursuant to the Transfer Agreement. It therefore follows that Talisman is not entitled to a declaration that it is the sole and exclusive owner of the SulphCo IP. Because Talisman is not the sole and exclusive owner of the SulphCo IP, Gunnerman did not breach the Transfer Agreement by any use or exercise of ownership, custody or control over the SulphCo IP.

7. In every contract, there exists an implied covenant of good faith between the parties. Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005). However, in the absence of any breach by Gunnerman of the Transfer Agreement, there is also no breach of any implied duty of good faith and fair dealing. Gunnerman also did not breach his warranty in the Transfer Agreement by assigning the SulphCo IP to SulphCo.

8. To establish tortious interference with contractual relations in Nevada, the Court must find: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage. J.J. Industries, LLC v. Bennett, 71 P.3d 1264 (Nev. 2003) (citing Sutherland v. Gross, 772 P.2d 1287, 1290 (Nev. 1989)). There was insufficient evidence that SulphCo, through Gunnerman, intended or designed to interfere with the provisions of the Transfer Agreement. Additionally, there was no actual disruption of Talisman's rights under the Transfer Agreement. Accordingly, SulphCo did not tortiously interfere with Talisman's rights under the Transfer Agreement by causing or inducing Gunnerman to breach the Transfer Agreement or otherwise interfering with Gunnerman's performance of his contractual obligations to Talisman under the Transfer Agreement.

9. Under Nevada law, conversion is a "distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein." Evans v. Dean Witter Reynolds, Inc., 5 P.3d 1043, 1048 (Nev. 2000). Because Talisman does not have a property interest in the SulphCo IP, Gunnerman and

SulphCo did not convert the SulphCo IP by exerting dominion over the SulphCo IP.

10. In Nevada, unjust enrichment occurs when a person has and retains a benefit which in equity and good conscience belongs to another. Mainor v. Nault, 101 P.3d 308, 317 (Nev. 2004). SulphCo is not liable to Talisman for unjust enrichment because it did not unjustly retain benefits to the loss of Talisman, or money or property belonging to Talisman.

11. Defendants are entitled to judgment in their favor and dismissal of all claims with prejudice.

### III. CONCLUSION

In accordance with the Findings of Fact and Conclusions of Law stated herein, IT IS HEREBY ORDERED that the Clerk of the Court shall enter judgment in favor of Defendants.

DATED: This 14th day of May, 2009.

_____
UNITED STATES DISTRICT JUDGE